[No. 41370.    En Banc.    September 23, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN DWIGHT CANADAY, *Appellant*.

*Phil Mahoney*, for appellant.

*Christopher T. Bayley, Prosecuting Attorney, William L. Kinzel* and *Patricia G. Harber, Deputies*, for respondent.

HALE, J.—The separate and mysterious disappearances of Mary Bjornson and Lynne Tuski were not solved until after John Thomas, a young naval officer, arranged to drive his sister Eunice to their parents' home for a weekend visit. Eunice failed to appear. Thomas, alarmed at her disappearance, made numerous inquiries, began a search, and reported her absence to the Seattle police. Finally, he found her to learn she had been forcibly detained for nearly 3 days by the defendant, John Dwight Canaday. In rushing to defendant Canaday's house to rescue his sister, John

Thomas set in motion an inquiry that revealed what happened to Mary Bjornson and Lynne Tuski.

Learning that Eunice had been seen leaving Canaday's car and entering his house, Thomas notified the police and drove at once to Canaday's residence. He arrived just as his sister, with rope burns on her neck and large bruises at the corner of her mouth, ran toward him from the house. A few brief remarks from her showed that she had been held prisoner by Canaday at a cabin at Rainbow Springs for 2 nights and forcibly brought in his car to his house in Seattle. Police officers summoned by John Thomas arrested Canaday for kidnapping a few minutes after Eunice had run from the house, but that was only the beginning.

When John Thomas led Seattle police officers to the home of John Dwight Canaday about February 22, 1969, to rescue his sister, no one involved in those events except Canaday had any idea that he was in any way involved in the disappearances of Lynne Tuski and Mary Bjornson. Taken then into custody on February 22, 1969, for the abduction of Eunice Thomas, Canaday revealed that not long before he had assaulted another young woman, one B.B., with a knife and then raped her. When a justice court complaint was filed against him on March 1, 1969, for that rape and assault, the police still had no evidence to connect Canaday to the disappearance of the two missing young women, Lynne Tuski and Mary Bjornson. Then, about 2 weeks later, on March 13th, while the defendant remained in custody in King County on the pending assault and rape charges, one William Kramer found a young woman's nude body partly concealed in the snow alongside the Index River Tract Road near Index in Snohomish County. The dead girl was Lynne Tuski. She had been raped and strangled to death with a rope.

Two days after the discovery of Lynne Tuski's body, on March 15, Mr. Donald Priest, Snohomish County deputy prosecuting attorney, after fully warning the defendant of his constitutional and statutory rights and privileges, interviewed him at the King County courthouse and questioned

him about the kidnapping and assault case, the assault and rape case, the murder of Lynne Tuski, and the disappearance of Mary Bjornson. At trial, testifying about that March 15th interview, he said that Canaday told him he had no knowledge whatever about either the Tuski homicide or the disappearance of any other girl.

Mary Bjornson had been missing from her apartment in the University District of Seattle since January 4, 1969, and her whereabouts were still a mystery to the police on March 19, 1969. On that day, defendant, after consulting with his attorneys, informed the police and the prosecuting attorney's office that he might be able to shed some light on the disappearance of Lynne Tuski and Mary Bjornson.

The next day, March 20, 1969, in the presence of his counsel, defendant gave a detailed oral confession to police detectives and the prosecuting attorney delineating how, on separate occasions, he had lured the two young women into his car, threatened them with a knife to keep them there, tied their hands with rope, and ultimately murdered each girl by strangulation. He told them where and how he had disposed of their bodies and described how, after each killing, he had removed the dead girl's clothing and taken it to his house in Seattle and there burned it in the fireplace. He later that day gave a detailed written confession concerning his assault upon and attempted rape of and his murder of Lynne Tuski; this statement was signed by him. The following day, March 21, after leading the police, sheriff's deputies, and members of the prosecuting attorney's staff to the area where he had disposed of the two victims, Canaday signed a confession which described how he had contrived to get Mary Bjornson into his car, had threatened her with a knife, tied her hands, raped her, and then killed her and disposed of her body. He signed this confession.

Corroborating his confessions and statements, Canaday, on March 21, 1969, led a group of officers from the King County Sheriff's office and the Seattle Police Department and other law enforcement officials to a rural area in Snohomish County near Index. He gave them detailed direc-

tions, advising them in one instance not to cross a bridge but instead to turn left onto what is called the Garland-Hotsprings Road, and told them that, after passing a gravel pit with a shed in the middle of it, the body of a young woman would be found on the north side of the road, just beyond a mound of snow. There, as the defendant had indicated, the officers found the body of Mary Bjornson, dead from strangulation as the defendant had said it would be.

Count 1 of the amended information charged defendant with the attempted rape of Mary Annabelle Bjornson on January 4, 1969, and count 2 with her murder in the first degree. Count 3 charged him with the rape of one B.B. on January 23, 1969, and count 4 with assault in the second degree with a deadly weapon upon her on that same day. Count 5 charged the defendant with the rape of Lynne Carol Tuski on January 25, 1969, and count 6 with her murder in the first degree on that date. May 5, 1969, he entered a plea of guilty to count 3, charging the rape of one B.B., and was sentenced to life imprisonment as a sexual psychopath; later, on July 8, 1969, defendant entered a plea of guilty to count 4, charging assault in the second degree. Brought to trial July 8, 1969, on counts 1, 2, 5 and 6, charging respectively the attempted rape of Mary Bjornson and her murder alleged to have been committed January 4, 1969, and the rape and murder of Lynne Carol Tuski on January 25, 1969, the defendant pleaded not guilty by reason of mental irresponsibility existing at the time of the crimes charged and persisting at the time of trial. A jury found Canaday guilty as charged on counts 1, 2, 5 and 6, and imposed the death penalty for the murder of Mary Bjornson as charged in count 2 and imposed the death penalty for the murder of Lynne Tuski as charged in count 6. Defendant now appeals the judgments and sentences of 20 years' and life imprisonment imposed respectively on counts 1 and 5 of the amended information and the death penalty imposed in accordance with the verdict of the jury on counts 2 and 6.

The defendant confirmed his earlier confessions and admissions under oath on both direct and cross-examination at the trial. Taking the witness stand after the state had rested its case in chief, John Canaday, on direct examination, after testifying that he was at the time of trial 24 years old, a high school graduate, an honorably discharged navy veteran, the father of two children and divorced, and acknowledging that he had two attorneys representing him after his arrest, testified as follows:

Q. You had an attorney in the city? A. Yes. Q. Who was that? A. Whipple, I believe. Q. And then did you have an attorney in the county? A. Yes. Q. Who was that? A. Phil Mahoney. Q. And did you have a discussion with Mr. Mahoney regarding the incidents with which you are charged here, that is, the death of Lynne Tuski and Mary Bjornson? A. Yes. Q. And did you express to him a desire to do something about it? A. Yes. Q. Did you request that he contact the authorities in relation to the matter? A. Yes. Q. Now, do you remember having a conversation with Mr. Mahoney and Mr. Carroll and Mr. Kinzel, Chief Nault and Lt. Schoener and myself in Mr. Carroll's office? A. Yes. Q. And after this discussion with those persons, did you then give written statements to Lt. Schoener in respect to the deaths of Lynne Tuski and Mary Bjornson? A. Yes. Q. Now, it is not your desire that you be turned loose at this time, is it? A. No. Q. Do you feel that you are dangerous to be at large at this time? A. Yes. Q. Now, at the very time that these incidents occurred, do you have a clear recollection of the incidents? A. If I sit down and think about it. Q. If you sit down and think about it? A. Yes.

On cross-examination, the defendant, referring to a piece of rope found by the police in his car, admitted that he had burned its ends to keep it from unraveling—something he had learned in the navy; described his work for the Seattle Water Department; identified pictures of his automobile; and then proceeded to testify concerning the attempted rape and the murder of Mary Bjornson:

Q. Okay. Now, when you went to the apartment that is located on Northeast 42nd, this was around January, the first part of January; is that right? A. Yes. Q. You indi-

cated that you were looking for a girl at that time; is that right? You said that in your statement? A. Yes. Q. Is there any reason, Mr. Canaday, why you happened to select that particular apartment? A. No. Q. Do you recall whether you saw this girl, the brunette—do you recall this as being the girl, the brunette girl, at this apartment? A. No. Q. We've been talking of a girl by the name of Mary Bjornson; do you know which incident we're talking about now? A. Yes. Q. Now, do you recall having seen her before you went up to the door and knocked on the door? A. No. Q. Well now, at the time that you were driving out of the parking lot in Aurora and you saw Lynne Tuski, and this is the blond girl; do you recall that? A. Yes. Q. Okay, now, you saw her and then you backed up the car; right? A. Yes. Q. Okay. Now, but you had never seen the Bjornson girl, the brunette, prior to knocking on the door? A. Yes. Q. But you had no other purpose at that point other than to look for a girl? A. Yes. Q. All right. Now, at the time you went to the door, were you wearing your peajacket? A. Yes. Q. This is it? (Indicating) A. It should have my name in it. Q. Okay. Let's take a look. A. Yes, it is. Q. And you had this peajacket on? A. Yes.

Then, corroborating his earlier confession that he had lured Mary Bjornson into his car by asking her help in getting it started, he continued, on cross-examination:

Q. Now, at the time that you went up to the door, do you recall what was wrong with your car? A. No—nothing. Q. Nothing was wrong with your car? A. Yes. Q. This story that something was wrong with the car was an invitation to her to come out; is that right? A. Yes. Q. Was she cooperative with you when you went to the door? A. I believe so. Q. Did she ask you where your car was parked? A. I don't—I don't recall. Q. Now, do you recall at this apartment and right adjacent to the apartment there is a freeway; do you remember the freeway that goes right to the west side of the apartment house? A. Yes. It's above somewhere. Q. Yes. Right. Actually it's to the west of the apartment house, I think; isn't that right? A. Well, I guess so. Q. Well, I don't want to put words in your mouth. But what I'm saying is it didn't take you very long to get onto the freeway after you left there? A. No. Q. When you went out to the car, did you open the hood? A. Yes. Q. What did you do when you

opened the hood? A. Nothing. Q. What did she do? A. I don't know. I didn't see. She started the car. Q. Well, did you tell her to start the car? A. Yes. Q. You said—What did you say to her? A. I can't remember just—I said, "Okay, start the car," or something. Q. And did she start the car? A. Yes. Q. Okay. Now, after that, you shut the hood on the car? A. Yes. Q. And then you walked around to the driver's seat or the driver's side or the passenger side? A. Driver's side. Q. And where was she sitting at that point? A. Still in the—Still in the car. Q. She was in the car. Do you remember if she had a coat on or not? A. She might have. Q. Did she have anything on her head? A. She might have. I don't know. Q. Do you remember a pink chiffon party dress? A. No. Q. Okay. Now, at this point did you just get into the car, or what did you do? A. Pulled the knife. Q. You pulled the knife? A. Yes. Q. Where was this knife? A. It was in the automobile. Q. Whereabouts in the automobile? A. Somewhere on the floor. Q. Was it underneath or under the seat or—A. Most of the time I used to keep it underneath the seat. Q. And showing you State's Exhibit 32, I will ask you is this the knife? A. Yes. I believe so. Q. This is the knife? (Indicating) A. Yes. Q. Now, when you used the knife, did you just hold it in your hand, or how—How did you use it? A. I had it in my hand. Q. Was it close to her? A. I think so. Yes. Q. I mean, in other words, she—She couldn't have run away the way you were holding her; is that right? A. Yes. I believe so. Q. So the knife was near any part of her body? A. You mean specific parts? No specific parts. Q. Well, I mean, say for example, I'm holding my hand here, how close to the girl were you holding the knife, this close or this close or how? (Indicating) A. I—I don't know. Q. Okay. Now, at that point, what did you do when you had the knife? What did you do at that time? A. She started screaming, and I put my hand over her mouth and told her to be quiet and she did. Q. Did she appear to be scared? A. Yes. I think anybody under that situation would. Q. Were you angry? A. No. Q. You weren't angry at this point? A. No. Q. Didn't you feel that someone might come running if she—if they heard the screams, or is that why you put your hand over her mouth? A. It didn't bother me. Q. At the point that you put the hand over her mouth, were you able to control her in any way? A. Yes. Q. Or how did you do that? A. Yes. Q. How did you

do that? A. I just put my hand over her mouth and dropped the knife and she shut up. Q. What did she do with her hands? A. Nothing. She was more scared of the knife than anything else. Q. Of the knife? A. Yes. Q. And then did you get into the car yourself at that point, or did you—What did you do with her? A. I got in the automobile. Q. Well, if she was in the driver's seat, how could you get into the car? A. She slid over. Q. Did you still have your hand around her mouth? A. No. Q. Did you still have the knife? A. Yes. I believe so. Q. Were her hands free? Wouldn't she have been able to get away? A. I believe so, yes, at that time. Q. But did you do anything with her hands? A. Tied them up. Q. And why—Where did you have this rope? A. I always carry rope in the automobile. Q. Whereabouts in the car did you have this particular piece of rope? Do you remember? A. No. Q. How long have you been carrying rope in the car, or is this something that you just put in the car prior to this? A. I've always had rope in the car ever since I owned it. Q. How long have you owned the car? A. About a year. Q. A year? A. (No verbal response; the witness nodded his head affirmatively) Q. Now, when you say you tied her hands, where did you tie her hands? A. In front of her. Q. Well, can you show—Show me. A. Like this. (Indicating) Q. Do you remember what kind of rope you might have used? A. No. I don't. Q. Was it rough grain like this, or was it a softer fabric? A. I don't know. Q. What kind of a knot did you put around there? Do you remember? A. No. I don't. Q. Now, did you leave immediately, or did you do anything there? Do you remember? A. What do you mean leave—left? Q. Well, did you drive away immediately? A. Yes; yes. Q. Where did you go at that point? A. Up on the freeway. Q. Did you have much trouble finding the entrance onto the freeway, or were you able to get there relatively—quite—very quickly? A. Quickly; very quickly. Q. Did she have anything over her mouth at this time? A. Not that I know of. No. Q. Was she perfectly quiet, or what did she say? A. She was still scared. Q. How do you know she was scared? A. She was shaking, evidently just— Q. She was shaking? A. I believe so; just that she was scared. Q. Did you have the knife in your hand as you were driving down the freeway, or do you recall? A. No. Q. Now, as you were going down the freeway, did you continue on for a long period of time, or did you eventually leave the

freeway? A. I left the freeway at the first exit that I noticed. Q. Is this before you get downtown, or do you recall? A. I don't recall. It's just the first one I noticed. Q. Did you know where you were going at that point? A. No; not really. Q. Now, when you left the freeway, what kind of a district did you go through? Do you remember that? A. It had a lot of houses; residential. Q. Did you ever come to any body of water? A. Yes. Q. Do you remember what body of water that was? A. It would be Lake Washington you mean. Q. Where did you go then? A. South. Q. To what point? A. To the hydroplane pit area. Q. I have a picture here of the hydroplane pits, and just so we all understand—have you ever been there, or were you there before this time? A. Yes. Q. Now, here's an aerial picture. Do you think you could kind of give me an idea of where you parked there? In other words, I think this is Lake Washington Boulevard coming down here. (Indicating) A. It was over here someplace. (Indicating) Q. You were in this large parking lot up in here? (Indicating) A. Yes. Q. When you parked, did you —Was it dark out? A. Yes.

He said that he told Mary Bjornson he intended to rape her. He was aware, he said, that the girl, with her hands tied and the knife still within his reach on the floor of the car, was frightened. He testified:

Q. In other words, you wanted to go—you would go ahead and rape her anyway? A. Yes. . . . Q. Well, how did she react to this? A. She started screaming. Q. Well now, when she started screaming, did she say anything with her screams, or did she just scream? A. I think she started screaming. Q. Did you react in any way to this at all? A. Yes. Q. How did you react? A. I put my hands around her throat. A. Well now, which—which way, John was she—Was her face facing you when you did that? Do you recall? A. It might have been out, I believe. I'm not sure. Q. In other words, was she facing the window or facing you? Do you know? A. I think the window. I'm not sure. Q. Did—Was the window down, or was the window up? Do you remember that? A. I think she rolled it down. I'm not sure. Q. Do you think she could have done this with her hands tied? A. Yes. Q. Why would that be? A. Because they wasn't tied to her body, just like you're handcuffed. A. I see. You could

move your hands around like this? (Demonstrating) A. Yes. Q. Now, at the time that she started screaming, where did you put your hands now on her? A. On her throat. Q. Do you remember was this right around like this, or how—how was it? (Indicating) A. I don't recall. Q. Okay. Did you say anything to her when you did this? A. I told her to stop screaming. Q. Were you scared? What were you—Why would you tell her to stop screaming? A. Just—It just disturbed me, that's all. I don't like people screaming in the first place. Q. Did it make you angry? A. In some ways, yes. Q. Did your wife used to scream at you? A. No. Q. Now, so we all know, did she say anything to you when you said, "Don't—Stop screaming?" A. I didn't hear anything. Q. And at the time you squeezed, was there any reaction from her? A. Not that I recall. Q. Did she continue to scream? A. Until I stopped squeezing. I just told her—or until I noticed she stopped, I stopped squeezing. Q. So, in other words, the—In other words, what caused her to stop squeezing—or screaming; was it the squeezing? Is that it? A. Yes. Q. What did you think after that, at that point? (There was no verbal response from the witness, and there was a pause in the proceedings) Q. Did you think there was something wrong with her when she stopped screaming? A. I thought maybe she'd be dead. Q. Did you at this point—Did you feel that something had gone wrong; I mean, that you had done something wrong? A. In a way, yes. Q. In other words, the act of squeezing her around her throat was the wrong thing to do? A. Yes.

He continued on cross-examination to corroborate much of the state's evidence. The killing of Mary Bjornson took place, he said, near Seattle in the vicinity of the hydroplane pits. With the dead girl still in the front seat, he drove his car to the area where he finally disposed of her body. Leading up to and describing how he had accomplished this, he continued on cross-examination:

Q. And was she still fully clothed at that point? A. Yes. Q. Now, when you drove, do you remember what route you took, or where you headed? Did you head north, east, south or west? A. North. Q. You went north. Now, why did you head north? A. I don't know. Q. Did you have some idea that you had to take care of this—get rid of the body in some way, or did you—What was your

idea? A. I realized I couldn't leave it there in town. Q. Why? Why did you feel that way about it? A. I don't know. Q. That somebody would find the body? A. Yes; something. Q. Now, when you went up north, do you remember where you went? Now, we have this State's Exhibit 12 up here, and is this pretty much an accurate direction that you went? (Indicating) A. You mean here at Index or— Q. Well, am I correct when I say that you went this direction and through and drove this way? (Indicating) A. I can't remember if I went through Everett or not. Q. No. But when we get to Monroe, is this the route that you took? (Indicating) A. Yes. That's the only road. Q. Okay. And did you recall looking for any particular spot as you were driving along the road? Do you remember? A. No. Q. And when you approached the Index area, was there any snow on the ground? A. Yes. Q. Did you have anything on your tires, any snow tires, any chains or anything? A. No. Q. So how were the treads on your tires? A. At that time they was good. Q. Pretty good? Did you think you'd make it in the snow pretty well? A. Yes. I wasn't bothered about driving in the snow. I've driven in the snow many years. Q. You are a skier, aren't you? A. Yes. Q. Where did you used to ski? A. Well, this year, I skied up at Mount Pilchuck. Q. Did you ever ski at Stevens? A. Yes. Q. Doesn't Leavenworth have a ski jump? A. Yes. Q. Did you ever take the ski jump? A. Not the large one; no. Q. How long have you been skiing? A. Ten years old. Q. Since you were ten? A. Yes; something like that. Q. When was the last time that you skied? A. December-January. Q. Now, had you ever been to Index before? A. No. Q. You never had? A. No. Q. But when you came up the road, you turned off the road; is that right? A. Yes. Q. And what was it that directed your attention to this particular road that you turned off on? A. I don't know. Q. Were you looking for side roads? A. Yes; I believe. Q. And then when you took this side road, how far could you go? A. I don't know. Q. Do you remember whether you crossed any bridges? A. No. Q. Now, here, you remember the trip up to Index with the police officers? Do you remember that? A. Yes. . . . Q. What did you do at this point? A. Stopped the automobile. Q. And from there what did you do? A. Took the body out. Q. Well now, did you get out of the car and walk around it or what? A. Yes. Q. Where did you put Mary at that point, the body? A. On the ground. Q. On

the ground. And what did you do then? A. Took off all of her clothes. Q. Now, what did you do with her coat? A. Laid it on the ground. Q. And then what did you do with the rest of her clothes? A. Put it in the coat. Q. Why did you do that? A. I don't know. Q. Was it to carry the clothes so you could pick them up like a laundry bundle? A. Oh, yes. Q. And now, did you take any jewelry off of her or anything like that? Do you recall? A. No, I don't. Q. Now, what did you do with her? A. Threw her over the snowbank. Q. How high was that snowbank? A. Shoulder high. Q. Was she very heavy? A. I can't recall. Q. Then you got back into the car. A. Yes. Q. You took the clothes with you? A. (No verbal response; the witness nodded his head affirmatively) Q. Did you drive back to Seattle, or where did you go? A. Seattle. Q. And where did you go then? A. Home. Q. Was there anyone home that night? A. I don't believe so. Q. Where were your step-parents that night? Do you remember? A. I don't. Q. Do you think they were up at the cabin at Granite Falls? A. They could have been. Q. What did you do after you got home? A. Burned the clothes. Q. Where did you burn the clothes? A. In the fireplace. Q. Now, is this the fireplace in the Peterson residence? A. Yes. Q. And how did you start the fire? A. With papers. Q. With newspapers? A. Yes.

Then, on further cross-examination, he described the rape, murder and disposition of the body of Lynne Tuski. He said that, while wearing his blue navy pea jacket and driving his white Chevrolet, and with his knife handy, he drove to a parking lot. There he saw a young woman with her car key in her hand "Getting ready to get into a car." He testified:

Q. Okay. Now, after you saw her, what did you do at that point? A. Stopped and asked her for directions. Q. And what did she say? What did she do? A. I think she give them to me or something. Q. What's that? A. I think she give them to me. Q. Do you remember what the directions were for? A. No. Q. Did she give you those directions? A. Yes. Q. And then what did you do? A. Started to drive off. Q. Was she nice about it when she gave you the directions? A. Yes. Q. Then what happened? A. I backed up. Q. Well, how far did you go before you backed the car up? A. I don't know, a car

length, maybe two—three. Q. Did she walk over to the car, or what happened then? A. I backed up, and I think I got out. Q. You got out of your car? A. Yes. Q. Okay. So, in other words, you had to stop your car? A. Yes. Q. And you got out? A. (No verbal response; the witness nodded his head affirmatively) Q. Where was she when you got out then? A. I think she was by some automobiles. Q. I didn't hear you. A. I say, I think she was by some automobiles. Q. Was she still walking, or was she still standing or standing? A. I think she was walking. Q. Now, at that point, was it cold out that night, too? A. Yes. Q. It was pretty cold, and at that point, did you walk over to her? A. Yes. Q. What did you say to her? A. Something to the effect, "Come on, you're coming with me." Q. I didn't hear you. A. Something to the effect of —THE COURT: You will have to speak up a little bit louder. I don't believe the jury over on the end can hear you. You can speak into the mike. Q. If you want to, this mike is on. A. All right. Q. You said to her what now? A. Something to the effect of that, "Come on, you're coming with me." Q. Well now, at that time did you have anything in your hand? A. Yes. Q. What did you have? A. The knife. Q. And is this the knife, State's 32? A. Yes. Q. Now, did she run or try to get away? A. I don't think so. Q. Why didn't she do that? A. She was scared, I guess. Q. She was what? A. Scared. Q. Well, did you have any hand on her or anything like that? A. Yes. I think I did. Q. Where did you have your hand? A. On the arm. Q. You mean, hooking it right under the arm? A. Something like that, yes. Q. Then you took her where? A. To the automobile, my automobile. Q. Now, is this—What side of the car did you put her in? A. Driver's side. Q. On the driver's side of the car? A. Yes. Q. And this would have meant that the door was open? A. I think so. Q. Did you get in beside her or what? A. Yes. Q. Well, how did you move her over to the other side? A. Slid over. Q. Now, I don't quite understand something. Now so that we clear up this whole picture of where we are, when you approached her to ask her for directions, was she on the driver's side or on the passenger side? A. What? Q. When you approached her and asked her for directions, when you drove the car up, was she standing outside of the driver's side or the passenger's side? A. The driver's side. Q. Okay. So that when you backed up the car and you got out to approach her with the knife, she was on the

driver's side; right? A. Right. Q. Okay. Now, when you got her into the car, did she scream? A. No. Q. Did she say anything? A. She might have, but I can't remember. Q. Why don't you think she screamed, or why don't you think she said anything? A. I don't think she screamed at all. Q. Do you think she was too scared? A. Yes. Q. Did you have the knife in your hand at the time that you pushed her into the car? A. Yes. Q. Mr. Canaday, when you got her in, did you use any rope on her? A. Yes. I tied her hands in front of her. Q. Is this the same way that you did with Mary Bjornson? A. Yes. Q. Tied her hands in front of her? A. (No verbal response; the witness nodded his head affirmatively) Q. Do you recall— Let me show you a piece of rope here, and I will ask you —This is a pretty small piece, and I don't know whether you're going to be able to tell me—but can you tell whether you've ever seen that before? A. No. I can't. Q. You can't tell? A. No. Q. Do you recognize this end here? A. It looks like it's wax or something. Q. Now, let me show you another piece of rope and ask you if you can recognize that piece. This is a piece of rope that was found under your dashboard near the air conditioner, and do you recognize that at all? A. I don't think so. No. Q. Could there have been a piece of rope there? A. Yes. Q. What was it there for? A. The air conditioner squeaked. Q. The air conditioner squeaked? A. Yes. Q. Is there any reason why there should be any hair on any of this rope—see? (Indicating) A. I don't want to talk about that. Q. In other words, you knew that there was hair on one of the pieces of rope? A. Yes. Q. All right. Now, after you got into the car and tied her hands, where did you go? A. Down to Golden Gardens. Q. Now, is this over here in the northwest part of the city where we have been talking about? You went down in here? (Indicating) A. Yes. Q. Did Lynne Tuski say anything to you as you were going down the—as you were driving to Golden Gardens? Do you remember that? A. Talking about something, but what I can't remember. Q. Can you remember what she said? A. No. Q. Do you suppose that she was wanting to know what was going to happen to her? A. If I was in the same situation, I would, yes. Q. And did you tell her what was going to happen to her? A. I can't recall if we had a conversation. Q. When you got down to Golden Gardens, did you park near the water? A. Turn around area. Q. The turn around area?

A. (No verbal response; the witness nodded his head affirmatively) Q. Is this this area that appears on State's 14, let's see, is that that area down here? Here's Shilshole Bay; this is where the boats are moored? (Indicating) A. All right. Q. You know where that is. Now, here's Golden Gardens Park. Do you remember where down there you parked? A. Over in here, I believe; there. (Indicating) Q. It's near a parking lot? A. Yes. Q. At the time you parked, did you have a conversation with her? A. Yes. Q. Was she trying to get out of the car at the time you parked? Do you recall that? A. No. I don't. Q. Was she still tied? A. Yes. Q. Hands in front. Did she have a gag over her mouth? A. No. Q. Did you put anything into her mouth at all, around her face? Do you remember that— A. No. I don't. Q. —at any time. A. Huh-uh. Q. There seemed to be some marks on her, the corners of her mouth. Do you remember that? Why would those be there? A. I don't know. Q. Now, what did you tell her, or what did you say to her after you parked? A. I think we talked a little bit. Then I told her I was going to rape her. Q. Do you remember what you talked about? A. No. Q. But you do remember saying you were going to rape her. A. Yes. Q. And how did you say you were going to do this? Were you going to do it right then, or did you order her to do anything? A. Get in the back seat. Q. To get in the back seat? A. Yes. Q. Well, what did she do? A. I think she was too scared, and she did it. Q. Did you have the knife out, or was the knife under the seat at that point? A. I don't think I had the knife; no. Q. Well, was she—Was Lynne Tuski in a position where she could crawl into the back seat with her hands tied? A. Yes. Q. Did you help her, or was she able to do it herself? A. I can't remember. Q. Now, after she climbed into the back seat, what did you do? A. I told her what I was going to do. Q. Well, did you get in the back seat, too? A. Yes. Q. Or stay in the front seat? A. Back seat. Q. What was her reaction to that? A. I don't recall. Q. What happened then? A. I raped her. Q. Did she fight you? A. Pushed me away. Q. Do you know whether she was a virgin or not, John? A. I think she was, yes. Q. Did you then get back into the front seat, or what? A. Yes. Q. Well now, John, at the time you were in the back seat and you were with her, was there anything that would have caused bruises to be on her face? Do you remember maybe her head hitting the door or something like that?

Do you remember that? A. No. Q. Because the reason I ask you that is that the doctor testified to certain bruises on her forehead and I was just wondering whether there may have been something that would have caused that. A. I can't remember anything. Q. And you don't remember the rope through the mouth? A. (No verbal response; the witness shook his head negatively) Q. Now, after that happened, did she stay in the back seat, or where did she go? A. We both got up in front. Q. Did she get up first, or did she go over first, or did you go over first? A. I think she went first. Q. When you told her to get over in the front seat, what did you intend to do at that point? A. Let her go. Q. You were going to let her go? A. Yes. Q. And so everything was going well up to the point when she started screaming? A. Yes. Q. And when she started screaming, what did you do? A. Took some of the rope that I had in the front seat and put it around her neck. Q. When you say you took some of the rope from the front seat, does this mean you had some extra rope—A. Yes. Q. —laying there? And this would have been what, just an odd piece of rope? A. Yes. Q. There was no loop on either end? A. No. Q. Where was she heading; where was her head facing at the time you did this? A. Out the window. Q. Did she roll down the window? A. I believe so. Yes. Q. Now, when you put the rope around her neck, what did you say to her? A. I think, "Stop screaming," or something to that effect. Q. Did she stop screaming? A. Yes, she did. Q. How did that happen now? A. When I let go of the rope, she was dead. Q. Did you know she was dead? A. Yes.

He then described how, with Lynne Tuski's body in the car, he drove into an isolated area near Index in Snohomish County, stopped the car and carried her body up the road a way. He removed all of her clothing and then concealed her body on the opposite side of a roadside bank. As to these actions, he testified:

Q. Now, when you got up the road, what did you do at that point? A. Laid her down. Q. What did you do? A. Took off all of her clothes. Q. The same as you had done with Mary Bjornson? A. Yes. Q. And then you put the clothes in the coat and put the coat in the car. What did you do with Lynne Tuski then? A. Put her over the bank. Q. Then what did you do? A. Got in the car and

went home. Q. At the time that you put her over the bank, do you remember taking anything off of her finger? A. No. I don't. Q. To your knowledge, when you put her over the bank, did she have everything off of her? A. Yes. Q. And when you got back home, what did you do? A. Burned her clothes. Q. Were your parents home that night? A. I don't believe so. Q. Okay. And was it because the ring wouldn't burn that you didn't burn the ring? A. I didn't realize I had a ring. Q. How did you think that that got in your drawer? A. I don't know. Q. How about the contact lenses? A. Not unless I had them in my pockets and I took everything out and threw it in the drawer. Q. It could be that these were in your pockets? A. Yes. Q. When you went back to your house? A. (No verbal response; the witness nodded his head affirmatively) Q. Now, did you feel at the time that you had finished the — or had strangled Lynne, did you feel that this was the wrong thing to do? A. Yes. Q. Are you sorry for what you've done? A. Taking any human life anybody should be sorry. Q. When did you become sorry, John? A. When? Maybe right after I did it or soon after. Q. Did you ever think that the Police would catch up with you concerning this? A. Yes.

The record thus contains overwhelming proof of guilt and sustains the verdict of the jury on each count tried. Defendant appeals the judgment and sentence entered on the verdicts and the two sentences of death. He makes 63 assignments of error, many of which are either unsupported by the record or lack sufficient merit to warrant discussion.

Defendant assigns error to denial of a new trial sought on the basis of newly discovered evidence. He contends that Eunice Thomas, the young woman whom he abducted and who was rescued from him by her brother and the police, could have supplied evidence tending to support his plea of insanity by describing his threats of rape, his stated intention to injure his former wife by carrying out these threats against Eunice Thomas, and his anxiety at his victim's refusal to acquiesce in his advances or yield to his threats. By means of his counsel's affidavit offered in support of this claim of error, he says that Eunice Thomas, whom he had

abducted and held captive by force and fear, could describe his behavior and his speech and statements. His counsel's affidavit, referring to Eunice Thomas, added, "she had been left with the impression, by the Prosecuting Attorney, that she should not discuss these things with anyone else," and that Eunice Thomas, the victim of the abduction, would, if called as a witness, testify that the defendant when he held her captive "began to develop an almost uncontrollable anxiety" at times and at others "would become kind and considerate." This comes from defense counsel's affidavit and not from the asserted witness, Eunice Thomas.

Miss Thomas did not confirm these assertions as to her purported views. In her affidavit considered by the court with that of defense counsel at the hearing on defendant's motion for a new trial, she described how the defendant lured her into his car on the ruse that he needed her assistance in driving another car to Seattle; and that, after inducing her to get into his car and driving for a while, defendant pulled over to the side of the road and then "tied her with ropes." She states that she was "held captive" by John Dwight Canaday from February 20 to February 22, 1969. Her affidavit stated that she had no opinion as to the sanity or insanity of the defendant during either the time he held her captive, during his trial or after it.

■ Defendant contends that Miss Thomas' asserted capabilities of describing his behavior and comments during the abduction, as shown in defense counsel's affidavit, amount to newly discovered evidence warranting a new trial. Whether to grant a new trial for newly discovered evidence rests within the sound discretion of the trial court, and a denial will not be reversed except for an abuse of that discretion. *State v. Franks*, 74 Wn.2d 413, 445 P.2d 200 (1968); *State v. Young*, 76 Wn.2d 551, 458 P.2d 8 (1969).

To warrant a new trial on the ground of newly discovered evidence requires five essentials: The newly discovered evidence must be such that it (1) would probably change the result of the trial; (2) could not have been discovered before trial by the exercise of due diligence; (3)

was actually discovered since the trial; (4) is material and relevant to the issues; and (5) is not merely cumulative or impeaching. *State v. Adams,* 181 Wash. 222, 43 P.2d 1 (1935); *State v. Gibson,* 75 Wn.2d 174, 449 P.2d 692 (1969); *State v. Peele,* 67 Wn.2d 724, 409 P.2d 663 (1966).

The evidence alluded to in counsel's affidavit and upon which a new trial is sought appears to have been neither newly discovered nor is it evidence available and admissible as competent, material and relevant. There was no showing that the purported evidence was unknown to or in the exercise of due diligence undiscoverable by the defendant before trial. Eunice Thomas, the proposed witness, had been held captive by the defendant for many hours; the accused knew that during this interval he had been under her observation and in her view. Defense counsel's affidavit made on behalf of the accused in support of the motion for a new trial acknowledged that defendant had forcibly taken the young woman to a cabin, threatened to rape her and held her involuntarily captive by force, fear and violence. It thus showed that Canaday had earlier and better knowledge of the witness and the information and facts to which she could testify than had the prosecution. Knowledge of what the witness saw, heard and felt was thus readily available to the defendant long before trial. Eunice Thomas' testimonial knowledge, therefore, from the very circumstances of her captivity was known to the accused long before trial and cannot be deemed newly discovered evidence.

The trial court could also consider whether the evidence described as newly discovered actually existed and would be available at a new trial. Defendant did not show in counsel's affidavit or elsewhere what Eunice Thomas would testify to on a new trial. Her affidavit not only failed to support counsel's affidavit but implied that she had no testimonial knowledge that would be material or relevant to the issues or tending to support the defense of insanity, and to the contrary could quite possibly show not only sanity, but scheme, design and premeditation. She neither said nor

implied that defendant's demeanor, behavior and conduct during her captivity gave her the opinion that he was insane or mentally irresponsible. Thus, none of the first four essentials to the granting of a new trial appeared to exist as set forth in *State v. Adams, supra,* and we hold perforce that the court did not abuse its discretion in denying a new trial sought on the grounds of newly discovered evidence.

In assignments 14, 15 and 16, defendant challenges the admission of exhibit No. 23, a diagram or sketch presumably drawn by Mary Bjornson to aid in giving someone directions, and to the testimony of one Donald Brian Zimmer, a neighbor of Mary Bjornson, regarding statements made to him by Mary Bjornson at a time before she entered Canaday's car for the ride that ended in her death. In its case in chief, the prosecution called Donald Zimmer, a young man who lived in an apartment near the one occupied by Mary Bjornson on the day of her disappearance. He was planning to entertain three guests in his apartment for dinner later that evening and Mary Bjornson came there at about 8 p.m. for a brief visit. She was at that time wearing a 1-piece pink chiffon dress and white high-heeled shoes. During their conversation, she indicated she was going out for the evening.

Following is the testimony of Mr. Zimmer, along with the admission of the sketch, to which error is directed. It should be noted that defendant made no objection to this testimony:

Q. (By Mr. Kinzel) Now, Mr. Zimmer, at the time that Mary came to your apartment at eight o'clock, did she make any statement relative to something that had just happened? Answer yes or no. A. Yes. Q. And what was the—What were the statements made by her? A. She said that a man had just been there, that is, to her apartment, asking about Steve, the proximity of Steve, which I inferred to be Steve Shelton who was a friend of Linda Williams' who lived there. She said that he had asked about Steve and that she—she had said that she didn't believe Steve was there, but that Linda Williams' apartment was upstairs, and she directed him up to Linda Williams' apartment. He came back, she said, a

short time later, and again then asked for a pencil and a paper to write a note which she gave to him, and then he left again and came back very quickly after that and said that he had left a note, that he would be back in about an hour. Q. Okay. Now, did she mention anything as to what this man wore? A. Yes. Q. What? A. She said he had on a blue Navy coat; those were her words. Q. Did she mention anything as to what he looked like? A. Yes. She said he looked young, rather husky. Q. Now, Mr. Zimmer, how long did Mary remain at your apartment? A. Until 8:30. Q. And what did she do then? A. She went back to her apartment, saying that she had something cooking on the stove and that she wanted to tend to that. Q. Did you ever see her again? A. No. I did not.

Zimmer testified that later, while still in his own apartment, he heard someone knocking at the door of Mary Bjornson's apartment. He heard her apartment door closing and then shortly thereafter the door closing again. More than 2 hours later that evening, when he entered her apartment, he saw that "food was still cooking on the stove," her "purse [was] in the bedroom," and her cigarettes were "on the kitchen table." Referring to the diagram (exhibit No. 23), he said that he and Mary had worked on some art projects together. And on the witness stand, he identified the sketch or diagram which had been found in her apartment by others as a drawing characteristically and distinctly hers. Defendant cross-examined the witness extensively.

Zimmer's testimony corroborated and was corroborated in turn by that of another young man, Donald Duane Thornton. Called as a witness by the prosecution next following Mr. Zimmer, Thornton said that he and Mary Bjornson were to go dancing that evening of January 4 at the Civic Center where a West Indian dance band was playing. He told her he would arrive at her apartment between 8:30 and 9. When he did get there at 9:05, he said, nobody was home, the curtains were open and the door unlocked. He "checked with Brian Zimmer who lived next door to see if she was over there, and he came out and said no, that she had gone back to the apartment to prepare

supper." Zimmer told him he thought she'd be back soon, so Thornton said he sat down and listened to music in Mary's apartment. He noticed the food cooking on the electric stove, and that the oven and three burners were on. On a piece of paper (exhibit 23) on the kitchen table, "There was a little diagram," the one which Zimmer identified (exhibit 23) as having been drawn by Mary Bjornson. No objection was made by defendant to Mr. Thornton's testimony. Corroborating this evidence, a police officer testified that on January 7, after Mary's disappearance had been brought to the attention of the police department, he found the diagram or sketch (exhibit 23) on the kitchen table of her apartment. He marked it with his initials and placed it in the department's evidence file.

Defendant objected to the admission of exhibit 23 on the ground that "while it has been identified as being an object that was found in the premises, it has not been connected to this case." He contends, too, that Mary Bjornson's remarks to Zimmer were hearsay, and that the sketch found on the kitchen table remained unconnected with any issues in the case. The prosecution urges that exhibit 23, the sketch, was properly identified and when regarded with all of the evidence proved to be material, relevant and competent and rationally connected to a wealth of other evidence presented in its case in chief. The prosecution thus contends that exhibit 23 was properly admitted; that Mary Bjornson's statements to Zimmer, unprompted and spontaneous—to the effect that a husky young man in a navy pea coat had made inquiries about one Steve Shelton—were admissible as a part of the res gestae. We find the state's position sound on both points.

As earlier noted, exhibit 23 was a sketch or diagram identified by witness Zimmer who, because he knew her style of drawing, testified it had been made by Mary Bjornson. The sketch had been found on her kitchen table shortly after her mysterious disappearance under circumstances of time and place from which the jury could infer that her disappearance was in some way related to or connected

with someone who had asked for and to whom she had given directions. The sketch, received in evidence as exhibit 23, was corroborated by defendant's written confession of the abduction and murder of Mary Bjornson and in turn was corroborated by the testimony of Zimmer who said that Mary had remarked to him that evening of her disappearance that someone had "asked about Steve Shelton." The stranger had asked her for pencil and paper with which to write Shelton a note and she had told Zimmer that he said he would be back in about an hour to see if their neighbor Steve Shelton had returned. From this testimony considered with all of the other evidence, it could be inferred that Mary Bjornson had given directions, illustrated by a sketch, to an unidentified man inquiring how to find Steve Shelton's apartment and who had later returned to her apartment and thence lured her away to her death. These inferences in turn were corroborated in time, place and event by the defendant's written confession, his oral statements to the police and sheriff's deputies and a wealth of other evidence. Exhibit 23, the sketch, competently identified by Zimmer as having been drawn by Mary Bjornson and found on her kitchen table, was, we think, material and relevant and, therefore, properly admitted.

There were several sound reasons for admitting Zimmer's testimony about the husky young man in the blue navy pea coat. First, most of Zimmer's testimony described the actions and a series of verbal acts of Mary Bjornson tending to prove that she had talked to Zimmer in his apartment at about 8 p.m., had been in Zimmer's presence until about 8:30, had left there saying that she had to tend to something cooking on her stove. It was during the course of this conversation with Zimmer that she casually remarked that a stranger had come to her door looking for a Steve whom she assumed to be a neighbor named Steve Shelton; that the stranger returned and asked for a pencil and paper with which to write a note to Steve; and that he had returned quickly saying he had left a note and would be back in an hour. This evidence could be viewed by the

jury as tending to show that Mary Bjornson was alive and in her apartment at 8:30; that she was not expecting to be leaving it to go anywhere except with Donald Thornton, the young man with whom she had a date to go dancing later that evening; and that her unexplained and mysterious disappearance was not connected with any of her plans for the evening. Zimmer said that later, about 15 minutes after Mary Bjornson had left his apartment, he heard the sound of her apartment door opening and closing and a short interval later being closed again, leaving the inference—subsequently fully corroborated—that she had left her apartment at about 8:45 p.m. When Thornton, her escort for the evening, testified that he asked Zimmer 20 minutes later or at about 9:05 if he knew where Mary was, the jury could infer that, during the intervals between the sounds of her door closing and Thornton's arrival at Zimmer's apartment, she had left her apartment for the last time. No objection was made to any of this testimony as it came in.

Nor was any objection particularly made to Zimmer's testimony that Mary Bjornson had said that the stranger inquiring about Steve Shelton who had said he would return later looked young, rather husky, and had on a blue navy coat. A blue navy pea coat found in a search of Canaday's bedroom closet, was later marked as exhibit No. 36 and received in evidence without objection.

Defendant knew that other evidence in possession of the state would show that he was a husky young man, and that at the time of Mary Bjornson's departure he was wearing a blue navy pea coat. Knowing this and that this evidence would be fully corroborated later by his own statements and in part by his written confession, defendant may have decided that objections would be pointless and thus made none to its admission. Before signing a written statement of confession to each crime, the defendant gave detailed oral statements to the police. Lieutenant Schoener of the Seattle homicide unit testified that Canaday at first denied knowledge of the two dead girls but later, when he asked if he knew anything of the disappearance of Mary Bjornson,

Canaday told him that he was involved. He described to the officer and later on cross-examination how, while wearing his navy pea coat, he had gone to her door, much as Mary Bjornson had related this incident to Zimmer. On cross-examination, the defendant, having made no objection directed to the testimony nor motion to strike nor request for instruction, supplied strong corroboration to this evidence when he described his first encounter with Mary Bjornson, and testified:

Q. Okay. Now, but you had never seen the Bjornson girl, the brunette, prior to knocking on the door? A. Yes. Q. But you had no other purpose at that point other than to look for a girl? A. Yes. Q. All right. Now, at the time you went to the door, were you wearing your peajacket? A. Yes. Q. This is it? (Indicating) A. It should have my name in it. Q. Okay. Let's take a look. A. Yes, it is. Q. And you had this peajacket on? A. Yes.

He thus on cross-examination corroborated the testimony to which he now assigns error by testifying that he had gone to Mary Bjornson's door; that while there was actually nothing wrong with his car he told her there was something wrong with the car in order to induce her to come out of her apartment and get into the front seat of his car; that she was cooperative when he went to her door; that he got her out to the car, lifted the hood and asked her to start the car; that she started the car and he walked around to the driver's side and pulled a knife he had concealed on the floor under the seat; and that she started to scream so he put his hand over her mouth telling her to be quiet. When asked on the witness stand, "Did she appear to be scared," he testified: "Yes. I think anybody under that situation would." According to the defendant, it was after Mary Bjornson had shown her fear of him and the knife that he drove her in his car away from her residence area to the place he described as the hydroplane pits on Lake Washington where ultimately he tied her hands and murdered her.

On cross-examination, when asked about the rape and murder of the other girl, Lynne Tuski, he said that, at the

time, he was wearing his blue pea coat. Thus, abundant evidence admitted without objection tended to prove the things which defendant now says were proved by the evidence to which he assigns error as hearsay, *i.e.*, that he was the person to whom Mary Bjornson referred when she casually mentioned to Zimmer that a husky young man wearing a navy pea coat had come to her door looking for Shelton and said he would return soon.

■ Aside from the absence of an objection or motion to strike out the testimony or request to the court to limit its application, the record shows that the remarks of Mary Bjornson to Zimmer were admissible as proof of the res gestae. The state produced Zimmer's testimony about the husky young man in a blue Navy pea coat inquiring about one Shelton and remarking that he would return later to show not only time, place and sequence of events but as a substantive part of its proof of the crimes charged. It was evidence tending to prove the commencement of the abduction, the departure, and the beginning acts in execution of a criminal scheme and plan. Statements growing naturally out of the event and made by the deceased spontaneously or instinctively evoked without premeditation or reflection, and made close enough in time to the event which produced the statements, exclude the presumption of design, calculation or fabrication.

Accordingly, these statements of Mary Bjornson to Zimmer concerning the husky young man in the navy pea coat were, we think, properly admitted as a part of the res gestae in accordance with principles stated in *Moen v. Chestnut*, 9 Wn.2d 93, 113 P.2d 1030 (1941), and *Beck v. Dye*, 200 Wash. 1, 92 P.2d 1113 (1939). Recently, in *State v. Daba*, 75 Wn.2d 234, 450 P.2d 183 (1969), this court, passing upon the res gestae exception to the rule against hearsay, affirmed these principles. In that case, it was contended that insults and name calling from across the street and other statements made to the deceased which preceded a fatal stabbing were inadmissible as hearsay. There was testimony that the victim's two companions asked defendant's

companion, one Quebral, "to call his friend off," to which Quebral answered, "Your friend asked for it, and he is going to get stuck." Discussing the objection to this evidence as hearsay, this court reviewed the res gestae principles and held that the conversation and verbal exchanges preceding the actual killing were all an integral part of the main event even though the stabbing required but a few seconds and the verbal exchanges covered about 10 minutes.

Declarant Mary Bjornson's statements, we think, meet the standards set by the res gestae rule concerning exceptions to excludable hearsay. Her casual, offhand remarks to her friend Zimmer that a husky young man in a navy pea coat had come to her door in search of one Shelton who lived in one of the apartments, and would return in about an hour, was a remark evoked by the event itself, not a product of deliberation or premeditation. It was a remark made so close in time to Mary Bjornson's leaving her own apartment never to be seen alive thereafter by anyone who knew her as to be part of the event or occurrence for which the defendant was standing trial. Her casual offhand comments made at a time when and under such circumstances that she could not have anticipated their significance belied the idea of deliberation, design or fabrication.

This court, along with many others, adheres to the rule as stated in 31A C.J.S. *Evidence* § 403(1) (1964), that, to be admitted as a part of the res gestae, "While the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation." *Accord: Wafers v. State,* 444 P.2d 825 (Okla. Crim. 1968); *State v. Reese,* 250 La. 151, 194 So. 2d 729 (1967); and *Smith v. State,* 44 Ala. App. 96, 203 So. 2d 279 (1967).

Similarly, in *Myers v. United States,* 377 F.2d 412 (5th Cir. 1967), six defendants were jointly charged by indictment of conspiracy to deprive Negroes of their civil rights by shooting, beating and killing Negroes, pursuing them in

automobiles, threatening them and committing other acts of terror. There was ample evidence to support the indictment. A witness, speaking of one Guest, allegedly involved in the same conspiracy but not on trial, testified that Guest had told him that the three defendants had been "chasing a Negro car with a D.C. tag on it;" that the three defendants had the declarant (Guest's) gun; and that he (the declarant) would have gone with them when they pursued the Negro to his car, but was alone at his place of business and couldn't leave it at the time.

Upholding the admission of these statements as a part of the res gestae, the court said:

> Moreover, since Guest himself had furnished the gun for the chasing of the Penn car, we agree with the United States that this statement by him as to the use that his co-conspirators were putting the gun to was admissible as part of the *res gestae*, that is of Guest's act in permitting his alleged co-conspirators to take his weapon with him. Rogers v. United States, 5 Cir., 334 F.2d 83, 84, 86.

Donald Zimmer's testimony concerning the statements made to him by Mary Bjornson was, we think, properly admitted.

Defendant directs several assignments of error to the removal of insanity or mental irresponsibility from the case. In instruction No. 25, the court expressly withdrew that issue from the jury's consideration. Defendant contends, too, that the court should have made a finding that he was mentally incompetent to stand trial.

As to defendant's competence to stand trial, no issue was ever made of it before or during trial. To the contrary, on the morning of trial, the defendant through his counsel requested leave of the court to withdraw his plea of not guilty and to enter a plea of guilty to count 4 of the amended information which charged him with assault in the second degree against one B.B. This request to withdraw and change pleas was made without any indication, suggestion or even implication that the defendant was in-

competent to make it, or that he was suffering from any mental or emotional disability that would vitiate his plea. The court thereupon granted defendant's request, allowed the plea of not guilty to be withdrawn and, so far as can be seen in the record, the defendant voluntarily, deliberately and competently entered the plea of guilty with neither indication nor claim of mental incompetency.

The record additionally shows that three psychiatrists examined John Canaday before trial—one on April 14, 1969, another on April 16, 1969, and the third not quite 2 weeks later, on April 27. Each doctor prepared and furnished the court and record with a detailed report of the examination and of his observations, findings and conclusions. Each psychiatrist found, and so reported in writing, that the defendant was sane and not psychotic at the time the crimes charged were committed. Two of the doctors expressly concluded from their examination that defendant appreciated his peril, was able to assist in his defense, and knew at the time of examination and at the time of the commission of the crimes charged the difference between right and wrong. There was no evidence whatever to the contrary and nothing in the record to warrant further inquiry by the court on the question of whether the accused was mentally competent to stand trial. *State v. Gwaltney,* 77 Wn.2d 906, 468 P.2d 433 (1970); *State v. Henke,* 196 Wash. 185, 82 P.2d 544 (1938); *Dusky v. United States,* 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960). Moreover, where there is little or no basis in evidence for a claim of incompetency to stand trial, the court is under no duty to require a mental examination. *State v. Tate,* 74 Wn.2d 261, 444 P.2d 150 (1968). The record shows no basis to support the claimed error that the accused was mentally incompetent to stand trial.

Whether the court properly withdrew from the jury the issue raised by defendant's plea of insanity or mental irresponsibility at the time of the commission of the crimes charged is, as noted, also raised as an assignment of error. Insanity or mental irresponsibility is not to be pre-

sumed. To constitute a defense to a criminal charge, the accused must prove by a preponderance of the evidence that he was suffering from a disease or mental condition so affecting the mind that, at the time the crime is charged to have been committed, he was unable to distinguish right from wrong with reference to the acts charged. *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970); *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Carpenter,* 166 Wash. 478, 7 P.2d 573 (1932); and *State v. Reece,* 79 Wn.2d 453, 486 P.2d 1088 (1971). As a general rule, the court ought not submit to a jury issues of fact which are unsupported by the evidence. *State v. Woods,* 163 Wash. 224, 1 P.2d 219 (1931). Insanity or mental irresponsibility being an issue raised by affirmative defense, is not to go to the jury unless there is substantial evidence to support it. The accused must, therefore, present substantial evidence of his insanity or mental irresponsibility or the court should not submit it as an issue to the jury. *State v. Tyler, supra; State v. Rio,* 38 Wn.2d 446, 230 P.2d 308 (1951); *State v. Piche,* 71 Wn.2d 583, 430 P.2d 522 (1967); *State v. Niblack,* 74 Wn.2d 200, 443 P.2d 809 (1968). Thus, where the affirmative defense of insanity or mental irresponsibility is pleaded and at the conclusion of the evidence there is no substantial evidence to support that plea, the court should withdraw the issue from the jury's consideration. *State v. Tyler, supra; State v. Rio, supra; State v. Piche, supra.*

The court ruled correctly when it withdrew the issue of insanity or mental irresponsibility from the jury, for the record shows a lack of evidence to support that issue and establish it as an affirmative defense. Of four witnesses called by defendant, not one gave evidence from which the jury could infer his insanity or mental irresponsibility. Dr. John B. Riley, a psychiatrist, testifying on defendant's behalf, said that the defendant was a sexual psychopath, a finding, he said, which excluded insanity, mental deficiency or irresponsibility; one who is mentally deficient, irresponsible or insane, he said, cannot under Washington law, be considered a sexual psychopath. On cross-examination, the

doctor testified that defendant's conduct and personality were consistent with sanity, that defendant had no disease which would prevent him from knowing the difference between right and wrong on the dates of January 4, 1969, and January 24, 1969, and that defendant knew the difference between right and wrong in the strangling of Mary Bjornson and Lynne Tuski. Neither witness Raymond Guy Van Gelder, a boyhood friend, nor defendant's brother, James, could or did testify that defendant was mentally irresponsible or insane, and the defendant's own testimony established no basis for such a finding.

Two other psychiatrists, Dr. Richard Jarvis and Dr. George MacDonald, who had examined the defendant, both testified that he was not mentally irresponsible or insane at the time of the two killings, and the defendant presented no evidence tending to show that he suffered from a mental condition or disease which rendered him incapable of distinguishing right from wrong in accordance with the rule in M'Naghten's case as applied in this jurisdiction. There being no substantial evidence to support the issue raised as an affirmative defense by plea of insanity or mental irresponsibility, the court properly withdrew it from the consideration of the jury.

In the next assignment of error to be discussed, defendant contends that it is unconstitutional to require one to defend on the issue of guilt or innocence and at the same time meet the issue of whether, in case of guilt, the death penalty be inflicted. Defendant thus assigns error to the submission of the two issues to the jury at the same time without interruption. Implicit in this contention is the argument that, in those jurisdictions where the jury and not the court must decide upon the death penalty, the constitutions require the courts to grant what has become known as a bifurcated trial, *i.e.*, a first trial on the issue of guilt and, if the verdict is guilty, then a separate trial to the jury on whether the death penalty shall be inflicted.

There is now little doubt that the legislature may constitutionally prescribe that the issue of the death pen-

alty be resolved by the same jury which tries the issue of guilt and that both issues may be resolved in one return of general and special verdicts, or as it is sometimes described the single-verdict procedure requiring that the jury return its verdicts into court at the same time at the conclusion of the evidence, summation and deliberation.

RCW 9.48.030 represents a time-honored prescription of this procedure, and one prevailing in the great majority of the states. This legislatively-established procedure for the trial of capital cases, requiring that questions of guilt and penalty be submitted simultaneously and resolved by the trial jury in its return of the verdict at the same time has almost universal support in this country. Defendant has not called our attention to any authority that this procedure constitutes a denial of due process of law or denial of equal protection of the laws or is otherwise invalid. In *State v. White*, 60 Wn.2d 551, 374 P.2d 942 (1962), and again in *State v. Cerny*, 78 Wn.2d 845, 480 P.2d 199 (1971), the court upheld the constitutionality of RCW 9.48.030. In *State v. Smith*, 74 Wn.2d 744, 776, 446 P.2d 571 (1968), passing directly upon this point, we said:

It is contended that the submission to the jury of the issues of guilt and punishment in a single trial resulted in the denial to the defendants of the right to present evidence on the issue of punishment. This contention is patently without merit, inasmuch as neither defendant was denied the right to present whatever evidence he thought relevant and desirable on this issue. The defendant Smith presented evidence about his background and capabilities; the defendant Riggins did not see fit to do so. Defense counsel also argued to the jury the reasons why the death penalty is considered by many to be unwise and unnecessary to effect the legitimate aims of society.

Here, as in *Smith*, the defendant supplied extensive evidence of his personal history, family relationships, marital life, social and educational background and development. At no time throughout the trial was defendant denied an opportunity to present to the jury competent admissible evidence touching upon the issue of the penalty. His candid

acknowledgment with many descriptive details of several vicious crimes, carried out by plan and scheme and after deliberation, freely confessed by him both in direct and on cross-examination, may have been largely motivated by the thought on his part that, in the face of such overwhelming and damning evidence this would be the best if not the only tactic available to him to avoid the death penalty. Whether a bifurcated trial shall be authorized in capital cases has always been and remains a question to be resolved by the legislature. Constitutional principles concerning due process and equal protection of law and procedures established to insure fair and impartial trials either by statute or rule do not mandate and legislatures are not required to provide for separate trials on the issues of guilt and punishment. That the legislature may provide for bifurcated trials does not mean that under the constitutions it must do so. *Spencer v. Texas,* 385 U.S. 554, 17 L. Ed. 2d 606, 87 S. Ct. 648 (1967); *United States v. Curry,* 358 F.2d 904 (2d Cir. 1966). This question has been laid to rest, we think, in *McGautha v. California,* 402 U.S. 183, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971), which held that the constitution does not bar the states from prescribing that the jury in capital cases shall in a single trial make simultaneous return of its verdicts as to both guilt and punishment.

Appellant assigns error to the search of his bedroom and his automobile by Seattle police officers and their seizure of certain articles at the time of his arrest. As earlier noted, Canaday was arrested at his residence when the officers were called there by John Thomas, a young naval officer whose sister had been held captive by the defendant for more than 2 days. A series of witnesses were offered by the state to lay a predicate for the admission of these exhibits. One Gerald L. Robinson, a mutual friend of John and Eunice Thomas, testified that on Friday, February 21, 1969, John Thomas called him at about 6 p.m., to tell him and his wife that he had been waiting 2 or 3 hours for Eunice and to inquire whether the Robinsons had any knowledge of her whereabouts or could offer any explanation of her ab-

sence. Robinson said he met John Thomas at Eunice's apartment about 8 p.m. to find two police officers there taking down a missing persons report. He said that Thomas mentioned that someone had given him a description that fit John Dwight Canaday. The next day they called the accused's former wife to find out the kind of car Canaday had been driving and where he would be living in Seattle. They were informed he would be driving a "white station-wagon, about a '65 or '66 model" and that he was living with his parents on Dayton Avenue North, at what sounded like No. 12527.

Robinson drove to that vicinity and "spotted a car that matched the description that I had of his car, and I noticed that Eunice Thomas was sitting in the passenger side on the front seat." Circling the block twice, Robinson drove past the house again and saw the same white station wagon in the driveway and saw Eunice and a man entering the house. He called John Thomas and 10 minutes later Thomas, accompanied by his uncle, arrived, and at that moment Eunice came running from the house telling them that Canaday had some guns and rifles. She was crying, he said, her eyes were red, and she had scars or bruises across her mouth and bruises on her neck. A few minutes later, the police arrived and the Thomases and Robinson reported to them what they had seen and heard.

John Thomas, in his testimony, corroborated Robinson's description of these events preceding the search, describing how he had waited for and searched for his sister and how he had learned that she had been last seen with John Dwight Canaday, the defendant. He told of learning that Canaday at the time had been driving a small white Chevrolet station wagon. He testified of calling Canaday's residence on the telephone, of Canaday's response, and then Thomas related to the jury as follows:

A. Yes. I asked, "John Canaday?" He said, "Yes." I identified myself and said that I understood he had my sister, and he very quickly said, "No; no. I dropped her off in the University District last night." I said, "You're a

liar. Someone just saw you take her into the house." At that point, he said, "Just a minute," and he went off the phone, and I could hear voices in the background. I couldn't determine or who or what was being said. I couldn't determine who was talking or anything else, but he came back on the phone and admitted or—Yes, admitted that my sister was indeed there. I demanded to talk to her. He said, "Just a minute," again, and repeated—I could hear murmuring of some sort in the background. He came back on and said, "Okay. Here's your sister." And my sister came on the telephone and I spoke with her briefly, and then he came back on and said, "She's okay," and then I said, "I'm coming out to get her," and then hung up. Q. Did he request any manner in which you come out there to his house? A. He did say, "Be sure and come alone." Q. And did you subsequently drive out to the Canaday house at 12527 Dayton Avenue North? A. Yes.

John Thomas corroborated Robinson's description of Eunice Thomas' battered condition, describing a large bruise on a corner of her mouth and rope burns around her neck.

When the police arrived a few moments after Eunice had run from the house, they met Eunice Thomas' uncle and Gerald Robinson, who informed them of what had transpired earlier and of the events of the 2 preceding days. Acting partly on information given them at the scene and partly on Eunice's appearance, they went to the door and Canaday opened it. The officers entered, told Canaday he was under arrest and advised him of his rights to remain silent and to an attorney. They then searched the white station wagon parked in the driveway. In the car under the edge of the front seat on the driver's side they found a trench knife and two pair of gloves in the front seat area, one glove being on the seat and three on the floor. They found several pieces of rope on the back seat of the car and on the front and rear floorboards. The knife, the gloves and some of the pieces of rope were marked as plaintiff's exhibits offered and received in evidence without objection.

Officers Robert Bender and Charles Lindbloom, almost immediately after entering the house, searched the area of

defendant's bedroom where they found a glove and a gray blanket similar to one they had seen in the station wagon, and in the bedroom closet they found a blue navy pea coat. These were admitted into evidence without objection.

█ Defendant did not object to their admission or make timely motion to exclude these exhibits. He raises the issue now for the first time. With rare exception, this court will not consider and reverse on claims of error made for the first time on appeal. The trial court must be given an opportunity to consider and rule upon claims of error related to the admissibility of evidence. *Fisher v. Jackson*, 120 Wash. 107, 206 P. 929 (1922); *State v. Murley*, 35 Wn.2d 233, 212 P.2d 801 (1949); *State v. Reid*, 74 Wn.2d 250, 444 P.2d 155 (1968).

We feel impelled, however, to consider the assignment of error despite the lack of objection or want of timely motion to exclude the exhibits on account of the intervention of *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969), filed June 23, 1969, long after the challenged search but less than 2 weeks before the commencement of trial July 8, 1969, and now cited by the defendant as a bar to the search for and seizure of evidence made at the time of his arrest at his residence on February 22, 1969.

In addition to the want of objection to the admission of these exhibits taken during the search of the station wagon and the accused's bedroom, and the lack of timely motion to exclude or bar this evidence, there are, we apprehend, many reasons why *Chimel v. California, supra,* is not applicable.

█ Assuming, without deciding, that the Chimel holding would apply if given retroactive effect, we think it was not designed to and does not operate retroactively but rather announces a kind of rule of criminal procedure which should be deemed to have prospective application only. *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *Johnson v. New Jersey*, 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772 (1966). This is in accord with the holding in *Desist v. United States*, 394 U.S. 244, 22 L. Ed. 2d

248, 89 S. Ct. 1030 (1969), that the wiretap rule declared in *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967), would not be given retroactive effect or application. We agree with the categorical statement in *United States v. Harris,* 435 F.2d 74 (D.C. Cir. 1970), that *Chimel* ought not and will not be given retroactive effect. *Desist v. United States, supra.*

But even if *Chimel* were given retroactive effect, it is doubtful that it would control here. In *Chimel,* three policemen went to the accused's home and were admitted by defendant's wife. They waited there to serve him with an arrest warrant for a coin shop burglary committed at a different time and place but not specified in the opinion. They had no search warrant, but over the accused's declared protests searched the house, attic, garage and workshop, opening and sifting the contents of drawers in the bedroom and sewing room. The search without a search warrant took between 45 minutes and an hour and yielded evidence of an incriminating nature including coins and medals. It should be noted that, although the *Chimel* opinion does not reveal where and when the burglary took place for which the arrest warrant had been issued, there is nothing either to suggest that at the time of his arrest on his return to his home where the officers awaited him with a warrant, the defendant was then engaged in, about to engage in, was withdrawing from the scene of, or fleeing from the commission of a felony. The search in *Chimel* was made under circumstances and conditions of minimal personal danger to the officers when they could quite readily have obtained a search warrant at the time they got the arrest warrant.

In the instant case, aside from the failure to note objections to the search and seizure at the trial or earlier, the search of the car and room was made at a time closely related to the arrest of the accused for a serious and violent crime then in course of or so close to completion as to be a part of it. The tests under both constitutions is whether the search was reasonable under the circumstances.

The officers here, unlike those in *Chimel,* were acting under the enormous pressures of a sudden and extremely grave emergency. Arriving at the accused's house under an emergent summons to find a young woman just released from a reported apparent kidnapping, abduction and assault, and bearing the marks of battery and physical captivity—crimes terminated so close in time as to be still a part of an apparent and continuous crime—with the perpetrator possibly armed and conceivably with confederates about the premises, the officers took what would appear to be reasonable and intelligent police action under the circumstances. First, they arrested the accused, taking him into custody, explicitly warning him of his rights to be silent and of the other rights and privileges said to apply to persons taken into custody. Then, moments later, they searched the automobile which had been reported to them as having been used in the commission of the crime, and after being freely admitted to the house, they almost simultaneously searched the accused's bedroom where he had obviously been.

The search of the car and the bedroom for weapons and other articles possibly employed in the commission of serious crimes of violence were, we think, under these circumstances of a continuing crime, reasonably incident and appropriate to a lawful arrest for a vicious crime of violence. The United States Constitution, amendment 4, states:

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Italics ours.), and Const. art. 1, § 7, states:

> No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Constitutionally, the basic test is whether the search was reasonable under the circumstances, and we think that under neither provision could the search and seizure be

deemed either unreasonable or unlawful in the circumstances and conditions revealed by the instant record. To hold otherwise would make the law itself a means of destroying and concealing evidence and the constitutions a device for preventing peace officers from taking reasonable steps to protect and preserve crucial evidence from destruction or mutilation, or loss of identity of crucial evidence through inability to preserve a continuous police custody of the exhibits, or protecting themselves and others from felonious assault by possible confederates, allies or friends of the accused. The search of the bedroom was, we think, lawful under *United States v. Rabinowitz*, 339 U.S. 56, 94 L. Ed. 653, 70 S. Ct. 430 (1950), and *Harris v. United States*, 331 U.S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098 (1947), and *Carroll v. United States*, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925); and of the automobile under the long-held principles reiterated in *Agnello v. United States*, 269 U.S. 20, 70 L. Ed. 145, 46 S. Ct. 4, 51 A.L.R. 409 (1925), and in *Chambers v. Maroney*, 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970).

The assignment of error, therefore, directed to the admission of evidence obtained in a search of defendant's automobile and bedroom a few minutes after his arrest in his residence is not well taken because (1) no objection to the admission of the articles taken in the search was made at trial or before; (2) no timely motion to exclude this evidence was made before or during the trial; (3) *Chimel v. California, supra,* ought not and does not have retroactive application; and (4) the search under these circumstances, even under *Chimel,* would be deemed a reasonable one and lawfully incident to the arrest.

■ Defendant directs assignments of error 2, 3, 4, 5, 6, 7 and 9 to the court's excusing of certain jurors for reasons of their opposition to the death penalty. In capital cases, veniremen may be excluded from the jury for conscientious or religious scruples against the death penalty by virtue of RCW 10.49.050 which precludes persons whose views are

such as to prevent them from returning a verdict of guilty.[1] Other statutes covering selection of juries provide for challenges by both parties. RCW 10.49.040, 4.44.170(2). Although defendant does not cite it, his arguments on these assignments are aimed at what we perceive to be the principles expressed in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and later in *Boulden v. Holman,* 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969), and *Maxwell v. Bishop,* 398 U.S. 262, 26 L. Ed. 2d 221, 90 S. Ct. 1578 (1970). Seven prospective jurors, in the course of selecting the jury, were excused by the trial court on the grounds of their stated opposition to the death penalty. In each instance, the venireman categorically declared that, regardless of the evidence, he or she could not possibly vote for the death penalty and could conceive of no case or circumstance in which he could bring himself to vote to impose it. Every prospective juror excused on this ground, in one way or another, stated his position against the death penalty as being fixed, irrevocable and unalterable, and that, regardless of the evidence, the circumstances and the court's instructions in case of a verdict of guilty, he or she would automatically vote against the imposition of the death penalty.

The record shows that in each instance the defendant made no objection to the exclusion of any of the seven prospective jurors, and further that no well-taken objection could have been made to the court's excusing them. The jury was selected, impaneled and sworn in accordance with the Witherspoon doctrine. *Accord: Hawkins v. Rhay,* 78 Wn.2d 389, 474 P.2d 557 (1970).

Finding insufficient merit in the remaining assignments of error to warrant discussion, we are of the opinion that

---

[1] RCW 10.49.050: "No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense."

688

the judgment should be and is, therefore, affirmed. So ordered.

FINLEY, ROSELLINI, HUNTER, NEILL, STAFFORD, and WRIGHT, JJ., concur.

HAMILTON, C.J., concurs in the result.

Petition for rehearing denied December 7, 1971.