STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

William LEACH, Defendant-Appellant.

Supreme Court

*Nos. 83–2326–CR, 83–2327–CR, 83–2328–CR, 83–2329–CR.*
*Argued May 29, 1985.—Decided June 28, 1985.*

(Also reported in 370 N.W.2d 240.)

---

649

For the plaintiff-respondent-petitioner the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Donald T. Lang,* assistant state public defender.

STEINMETZ, J.   Two issues are raised by the state:

(1) May a court properly direct a verdict against a criminal defendant on the issue of mental disease or defect?

(2) May the improper joinder of criminal charges for trial ever be harmless error?

The defendant raises two more issues:

(1) Was the defendant denied due process when he was compelled to proceed to trial while claiming amnesia?

(2) Was the defendant denied his right to the effective assistance of counsel on the attempted murder charge due to trial counsel's failure to request a lesser offense instruction on endangering safety by conduct regardless of life?

The circuit court for Milwaukee county, the Honorable Michael J. Barron, determined that it was proper to direct a verdict against the defendant when no reasonable jury could have found that he was legally suffering from mental disease or defect. The court of appeals interpreted *State v. Bergenthal,* 47 Wis. 2d 668, 178 N.W.2d 16 (1970), *cert. denied* 402 U.S. 972 (1971), to mean that the issue of mental disease or defect may never be taken from the jury. The court of appeals further held that improper joinder is not subject to the harmless error rule. Therefore, on both issues the court of appeals reversed and remanded the case to the trial court. On those two issues we disagree with the court of appeals. Also, the court of appeals ruled against the defendant's claims of incompetent counsel and of being required to proceed to trial while allegedly suffering from amnesia, and we agree with the decision of the court of appeals as to these two issues raised by the defendant.[1]

---

[1] *State v. Leach,* 122 Wis. 2d 339, 363 N.W.2d 234 (Ct. App. 1984).

William Leach was charged in four separate complaints filed February 5, 8 and 9, 1982, with four counts of armed robbery and one count each of attempted murder, attempted armed robbery and false imprisonment, stemming from four historically distinct incidents. Following a single preliminary examination on March 2, 1982, four informations were filed charging the same counts. The defendant pleaded not guilty and not guilty by reason of mental disease or defect to all charges.

At the arraignment the district attorney moved to join all the various counts for trial. Although the transcripts indicate the trial court deferred a decision on the motion, the judgment roll reflects that the motion was granted. Unfortunately, no record was made as to the trial court's reasoning in granting the joinder motion, but in this case the state conceded at oral argument that the joinder was done in error.

A consolidated trial on all counts commenced November 29, 1982. Before the first witness was called, defense counsel orally moved for severance of the charges. The trial court denied the motion, saying the issue had been resolved when the state asked for joinder. At the close of the guilt phase of the trial, the jury found the defendant had committed all seven of the offenses with which he was charged.

After the defendant presented his evidence at the second phase of the bifurcated trial, the court directed a verdict against him on the issue of mental disease or defect.

A factual description of the offenses with which the defendant was charged is necessary. On January 7, 1982, the defendant picked up Stanley Blalock and drove to 3424 North 12th Street in Milwaukee. They stayed there for a short time. Some time later that day, Blalock and the defendant burglarized a home taking among other things a color television set. They returned to the

North 12th Street apartment where the defendant argued with Blalock and accused him of appropriating the proceeds of the crime. The defendant left and returned 15 to 20 minutes later.

Sometime in the early morning hours of January 8, 1982, Blalock asked the defendant if he could retrieve his boots from the defendant's car. Blalock testified the defendant had a "strange" look on his face, "as if he was up to something." The defendant and Blalock went to defendant's car and as Blalock reached into the car, the defendant shot him in the back. Blalock pulled back and asked what he was doing, whereby the defendant responded "you know what I am doing." Blalock lunged at the defendant. Because his left hand was paralyzed from the wound, Blalock hit the defendant with his right hand. The defendant then shot Blalock in the shoulder. Blalock pushed the defendant back and ran. The defendant shot him again, hitting him in the right thigh. Blalock ran into a house across the street and told them what had happened. The next thing Blalock remembered was the inside of the ambulance.

Blalock was hospitalized for about two weeks. The doctors decided not to try to remove the bullet from his back because it was lodged too close to a blood vessel leading to his heart.

On January 29, 1982, Gregory Greenwood, a friend and two young women were out on a double date. At approximately 11:30 p.m., Greenwood parked his father's automobile on the northwest side of Milwaukee in an area commonly used by high school students for socializing. A short time later the two females left the car. As the females were returning to the car, they were approached by the defendant and asked what they were doing there. One of the girls stated they were not doing anything and started to walk away from the defendant, but he followed them. Because the two females

did not want to get their dates in trouble, they decided not to return to the car. Greenwood testified he saw the two females followed by the defendant walking a short ways away not returning to the car but proceeding down the road. Greenwood became concerned and called to the females to come back. He approached the two young women and the defendant and asked what was going on. The defendant said nothing was going on, pulled out a gun and ordered them into the car.

The defendant instructed Greenwood to drive. At various times the defendant told Greenwood to stop the car. At one point the defendant told Greenwood to stop the car and pointing the revolver at Greenwood's head, demanded money from those in the car. They claimed they had no money and the defendant searched the females' purses. The defendant then told them they had three seconds to come up with some money. Fearing for their lives, Greenwood and his companions gave the defendant most of their cash.

The defendant then ordered Greenwood to keep driving, periodically telling Greenwood to stop the car. About two hours after they first met, the defendant ordered the driver to stop the car and all its passengers out. The defendant took the car and Greenwood went to the nearest house to call the police.

On February 6, 1982, Mrs. Shang Yu Huei Lee was working as desk clerk at the North Shore Inn in Glendale awaiting the arrival of the usual desk clerk. The defendant, having stayed at the hotel for three days, entered the hotel lobby. Conversation took place; the defendant left and returned sometime later. He approached the desk and pointed a gun at Mrs. Lee's head and demanded the motel's money. She opened the cash register and handed him its contents. At that point, one of the maids entered the lobby. The defendant demanded more money. Mrs. Lee opened another money drawer

and handed the defendant its cash. The defendant ordered Mrs. Lee and the maid into the office closet.

Shortly thereafter, Dale Tech reported for duty as desk clerk. Upon entering the lobby, the defendant pointed his gun at Tech and asked whether he had a car and where it was parked. Tech responded he had a car and it was in the parking lot. The defendant reached into Tech's pocket, took his wallet and instructed Tech to pick up the defendant's bags and go to the car. On the way out, the defendant ripped the phone lines out of the motel room and off the switchboard and handset.

When they got to the car, the defendant put his luggage into the trunk and told Tech to drive. Still pointing his gun at Tech, the two drove for some time. The defendant then told Tech to stop the car and get into the trunk. Tech refused three times claiming it was too cold and that he had cooperated with the defendant and the defendant should cooperate with him. The defendant told Tech he had shot people before and again ordered Tech to the trunk. Tech again refused and the defendant allowed him to lay on the floor in the back seat. The defendant proceeded to drive the car and finally parked it in a garage at 3323 North 22nd Street. The defendant exited the car, removed his luggage and instructed Tech to remain in the car for ten minutes. The defendant then threw the keys up onto the opened garage door. Tech waited ten minutes, retrieved his car keys and notified the police of what had just happened.

Two days later, at approximately 11:55 p.m. on February 8, 1982, the defendant entered the Park Avenue Nightclub. He entered the upstairs office, pulled a gun on the secretary in the outer office, and ordered her into the manager's office. The general manager, David Watt, testified the defendant waved his gun in his face and told him and the secretary to lie on the floor.

The defendant asked Watt where the money was and he answered it was in the next office. The defendant told Watt to get up and take him there. The defendant, Watt and his secretary entered the small room whereupon the defendant ordered Watt to open the safe. Watt complied and the secretary proceeded to put the paper currency from the safe into the defendant's folder. She finished putting the money into the folder and Watt offered it to the defendant. As the defendant reached for it, Watt let it drop to the floor. The defendant reached down to pick it up and Watt grabbed the defendant's hand which was holding the gun. A struggle ensued and Watts' secretary screamed for help and ran out of the room. The defendant dropped the gun and ran out of the office. The day maintenance man heard the commotion and as the defendant ran past him he grabbed him and forced him to the ground. Watt and the maintenance man subdued the defendant until the police arrived.

At the sanity phase of the trial, Dr. William J. Crowley, a psychiatrist, testified that he interviewed the defendant. In response to his questions, Dr. Crowley stated the defendant often responded "I don't know" or that he did not understand the question. Dr. Crowley stated that because he received little useful or relevant information, he switched his goal of examining the defendant's mental capacity to determining whether he was so impaired that he would not be able to understand the court proceedings or participate in his defense.

Dr. Crowley testified that based upon the information he obtained from the defendant "there was no way [he] would be able to reach any conclusion about [the defendant's] mental state at the time of these offenses" and that he was unable to determine whether the defendant was suffering from schizophrenia at any time.

Though he could not form an opinion to a reasonable degree of medical certainty, Dr. Crowley stated in his own mind he doubted whether the defendant was competent to stand trial. He did not know whether the defendant was willfully withholding information and malingering or whether he genuinely could not recall and suffered from some type of mental impairment. At the time of his examination, Dr. Crowley only recommended in-patient evaluation.

Dr. Crowley stated the defendant mentioned he had slipped and hit his head and suffered headaches, but that the defendant's electroencephalogram was normal, that is, there were no organic lesions on the brain and the electric activity was also normal. The defendant claimed he was hospitalized for that fall, but it was never verified. The defendant also claimed to Dr. Crowley that he attempted suicide twice. That claim could have been verified but the defendant did not do so. Lastly, Dr. Crowley testified there was nothing in the nature of the defendant's crimes, nothing innately strange about the offenses, that would lead him to conclude the defendant was suffering from mental disease or defect.

Dr. Kenneth Smail, a psychologist, similarly had difficulty getting the defendant to respond to questions during his examination. Dr. Smail testified he conducted psychological tests of the defendant to determine whether or not a real mental disease or defect was present or whether the defendant was malingering. Dr. Smail stated he attempted to administer the Wechsler Adult Intelligence Scale Revised test in an attempt to measure the defendant's intelligence, but the defendant refused to respond substantively to the questions presented.[2]

---

[2] Dr. Smail testified his attempt to administer the psychological tests were met with this kind of responsiveness:

Dr. Smail testified he interviewed the defendant a second time and at that time the defendant looked depressed and he was unable to accomplish anything more than he did in the first. He stated he asked the same questions and though the answers were somewhat different, he still was unable to form an opinion to a medical degree of certainty that the defendant was suffering from mental disease or defect at the time the offenses were committed. Moreover, Dr. Smail testified there was nothing in the reports which would be suggestive of a mental disease or defect or any particular psychological abnormality.

### Directed Verdict

. Section 971.15(3), Stats.,[3] places the burden of establishing the affirmative defense of mental disease or

"I asked when he was born and he said, 'I don't know, man; I really don't know.' I asked where he was born and he said, 'I don't know, man; I really don't know.' I asked when he was born and he said, 'I think it was this month.' . . . I asked him the year, and he said, 'I just don't know.' I asked him where he was raised, and he said, 'I don't know the answers to all these questions, man.' I asked if he had some problems with his memory and he said, 'Sometimes.' And I asked if he would tell me about that, and he said, 'Sometimes I forget; sometimes I don't know.' I asked him how long he had been in jail. He said, 'I don't know.' I said, 'Well, has it been days or has it been years or has it been months?' And he said, 'I think it's been longer than a day. I think it's been about'—and paused and said, 'I don't know, sir.' I asked what he was charged with, and he paused and said, 'I think it's murder.' And I asked what the police say happened, and he said, 'I don't know.' I said, 'Do you know anything more about it than murder?' And he said, 'No.' I asked him how old he was, and he said, 'I think I am in my 30s.' . . . And at that point, I said, 'Well, what can you tell me about yourself? He paused and looked at me and said, 'Like what do you want to know or like what?' And I gave him a rather nondirect response like—I don't have my response but something to the effect of 'Whatever you can think of.' And he said, 'I don't know.' "

[3] Sec. 971.15(3), Stats., provides:

defect on the defendant to prove it to a reasonable certainty by the greater weight of the credible evidence. *See Schultz v. State,* 87 Wis. 2d 167, 169, 173, 274 N.W.2d 614 (1979). *State v. Dix,* 86 Wis. 2d 474, 489, 273 N.W.2d 250 (1979).

The court of appeals interpreted our decision in *State v. Bergenthal* to mean the issue of mental disease or defect may never be taken from the jury. The court of appeals misapplied *Bergenthal* since the question there was whether the trial court erred in denying the defendant's motion to direct a verdict against the state under the facts of that case. *Bergenthal,* 47 Wis. 2d at 685. In *Bergenthal,* the state presented no witnesses of its own but relied on cross-examination of the defense experts to rebut the initial evidence of mental disease or defect. This court held that: "On the record here, direct and cross-examination included, a reasonable juror could find the defendant sane," and therefore, the "question of whether the defendant had met his burden of proof was one of fact for the jury, not one of law for the court." *Id.* at 685–86.

*Bergenthal* holds only that it was proper for the trial court to refuse to withdraw the issue in that case where the evidence was sufficient to permit the jury to reasonably find for either side. *Bergenthal* does not hold that a court can never rule as a matter of law that the evidence is so single-sided that the defense of mental disease or defect should be withdrawn from the jury. If reasonable minds can reach different conclusions from the evidence, the question is for the jury. "If only one reasonable inference can be drawn from the evidence, the drawing of that inference is a question of law" and is a question for the judge. *Vocation. Tech. & Adult Ed. Dist. 13 v. ILHR Dept.,* 76 Wis. 2d 230,

---

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

240, 251 N.W.2d 41 (1977). After interpreting the evidence in a light most favorable to the accused asserting the defense, if reasonable minds cannot reach different conclusions from the evidence but agree the evidence against mental disease or defect is so overwhelming, it is the duty of the court to rule on the issue as a matter of law so as to preclude the jury from speculating on the question. *See* 23A C.J.S. *Criminal Law,* sec. 1130 at 284–86 (1961) and cases cited therein. Mental disease or defect becomes an issue of fact when there is credible evidence having probative value to present a jury question.

The question of whether a defendant has met the burden of proving mental disease or defect is one of fact for the jury rather than one of law for the court. *State v. Sarinske,* 91 Wis. 2d 14, 48, 280 N.W.2d 725 (1979); *Pautz v. State,* 64 Wis. 2d 469, 475–76, 219 N.W.2d 327 (1974). These cases dealt with whether the jury made a proper decision once the defense has been presented to them. They applied the principle that a jury's finding will not be upset when there is sufficient evidence to support it. *Sarinske,* 91 Wis. 2d at 48, and *Pautz,* 64 Wis. 2d at 476. The reasonable corollary to this principle is that the finding will be upset when the evidence is not sufficient to support it and especially when no credible evidence has been received to support it. If on review an appellate court may reverse a jury finding of mental disease or defect when no evidence has been offered to sustain it, it is only logical that a trial court may direct a verdict on the issue against the defendant when no credible probative evidence has been presented.

Numerous state and federal appellate courts have agreed that a trial court may withdraw the issue of mental disease or defect from the jury's consideration

if the evidence of mental disease or defect is insufficient to create a jury question. *Williams v. Wainwright,* 712 F.2d 1375, 1376–77 (11th Cir. 1983); *United States v. Jackson,* 587 F.2d 852, 854 (6th Cir. 1978); *United States v. Bass,* 490 F.2d 846, 850 (5th Cir. 1974); *Mc-Kinnon v. State,* 405 So. 2d 78, 80 (Ala. Crim. App. 1981); *Kleinbart v. United States,* 426 A.2d 343, 355 (D.C. App. 1981); *People v. Proper,* 68 Ill. App. 3d 250, 385 N.E.2d 882, 885 (1979); *State v. Booth,* 169 N.W.2d 869, 871 (Iowa 1969); *Commonwealth v. Mattson,* 377 Mass. 736, 387 N.E.2d 546, 550 (1979); *State v. Neel,* 177 Mont. 93, 580 P.2d 456, 458–59 (1978); *State v. Valenzuela,* 90 N.M. 25, 559 P.2d 402, 409 (1976); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510, 536–37 (1979), *cert. denied,* 448 U.S. 907 (1980); *Commonwealth v. Plank,* 478 A.2d 872, 874 (Pa. Super. 1984); *State v. Canaday,* 79 Wash. 2d 647, 488 P.2d 1064, 1082 (1971) (*en banc*), *vacated on other grounds* (death penalty), 408 U.S. 940 (1972). *See also* 23A C.J.S., *Criminal Law,* sec. 1130 at 285–86.

Section 971.06, Stats.,[4] requires that the defense of not guilty by reason of mental disease or defect be raised before trial by entry of a plea.

The purpose of the requirement is to provide the prosecutor with advance notice that the defense will be raised. The plea triggers pretrial procedures for the appointment of experts to examine the defendant. Sec.

---

[4] Sec. 971.06(1), Stats., provides:

"**971.06 Pleas.** (1) A defendant charged with a criminal offense may plead as follows:

"(a) Guilty.

"(b) Not guilty.

"(c) No contest, subject to the approval of the court.

"(d) Not guilty by reason of mental disease or defect. This plea may be joined with a plea of not guilty. If it is not so joined, this plea admits that but for lack of mental capacity the defendant committed all the essential elements of the offense ·charged in the indictment, information or complaint."

971.16(1) and (3). The reports of these experts must be made available to all attorneys before trial. Secs. 971.16(2) and (3).

The issue of not guilty by reason of mental disease or defect is tried separately from the question of whether the defendant committed the acts which constitute a criminal offense. Sec. 971.175. The principal purpose of bifurcation is to withhold from the jury, while it debates the question of guilt or innocence, evidence which is not legally relevant to that question. *Steele v. State,* 97 Wis. 2d 72, 92, 294 N.W.2d 2 (1980); La Fave and Scott, sec. 40 at 315. This permits the defendant to fully litigate the issue of mental responsibility without compromising his ability to contest the issue of guilt. *Steele,* 97 Wis. 2d at 92. Bifurcation protects both the defendant and the state from having to confront evidence which if introduced in the guilt phase, could confuse the jury or appeal to its prejudice or sympathy. La Fave and Scott at 316.

The United States Supreme Court has often said that a verdict of guilt cannot be directed against the defendant in a criminal case. *Brotherhood of Carpenters v. U. S.,* 330 U.S. 395, 408 (1947). This prohibition is aimed at the elements of the criminal offense. *Belton v. United States,* 382 F.2d 150, 154, n. 9 (D.C. Cir. 1967) and cases cited. It is because the prosecution must prove every element of the offense beyond a reasonable doubt that a verdict of guilt may not be directed. The constitution does not require that a defendant be allowed to present the affirmative defense of not guilty by reason of mental disease or defect to the jury when he has failed to produce sufficient evidence to raise a jury question.[5]

---

[5] In *Muench v. Israel,* 715 F.2d 1124, 1144–45 (7th Cir 1983), the United States Court of Appeals held "that a state is not constitutionally compelled to recognize the doctrine of diminished

A criminally charged defendant has no entitlement to the luck of a lawless decision maker. *Strickland v. Washington,* 104 S. Ct. 2052, 2068 (1984). He has no right to insist that the jury be given a special opportunity to acquit him on the basis of nothing more than speculation, conjecture or compromise concerning a defense to the crime with which he is charged. *Johnson v. State,* 85 Wis. 2d 22, 35, 270 N.W.2d 153 (1978). This is what a defendant who merely claims he had a mental disease or defect at the commission of the offense would be given if he were entitled to have a jury consider and determine his defense, even when there is no evidence on which a reasonable jury could find that he was actually suffering from some kind of mental disease or defect.

The trial court should be permitted to withhold defense of not guilty by reason of mental disease or defect, like other defenses, from the consideration of the jury when there is no evidence presented or there is insufficient evidence to present a jury question on the defense. It should be permitted to direct a verdict against the defendant if the judge finds there is no credible probative evidence toward meeting the burden of establishing the defense of not guilty by reason of mental disease or defect by a preponderance of the evidence after giving the evidence the most favorable interpretation in favor of the accused asserting the defense.

The standard for determining when a verdict should be directed against a party having the burden of proof by a preponderance of the evidence is well settled. "The test is whether there is any credible evidence which under a reasonable view would support a verdict contrary to that which is sought." *Thompson v. Howe,* 77

capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent."

Wis. 2d 441, 448, 253 N.W.2d 59 (1977). As we stated in *Zillmer v. Miglautsch,* 35 Wis. 2d 691, 698–700, 151 N.W.2d 741 (1967):

"A case should be taken from the jury and a verdict directed against a party:

" ' ". . . only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion." ' *Anderson v. Joint School Dist.* (1964), 24 Wis. 2d 580, 583, 129 N.W.2d 545, 130 N.W.2d 105, citing *Smith v. Pabst* (1940), 233 Wis. 489, 288 N.W. 780, and *Rusch Sentinel-News Co.* (1933), 212 Wis. 530, 533, 250 N.W. 405.

"Also:

" 'A verdict ought to be directed if, taking into consideration all the facts and circumstances as they appear in evidence, there is but one inference or conclusion that can be reached by a reasonable man.' *Milwaukee v. Bichel,* ante, p. 66, 150 N.W.2d 419.

"In determining whether or not the trial court was in error in failing to direct the verdict, this court must take that view of the evidence which is most favorable to the party . . . against whom the verdict was sought to be directed. . . . If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury. . . . The weight and sufficiency of the evidence is for the jury, . . . as is the weight to be given to the witness' positive or negative testimony. . . . Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury. . . . If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury. . . .

"Nevertheless, the [party having the burden of proof] must come forward with evidentiary facts that establish the ultimate facts; and the degree of proof must be such as to remove these ultimate facts from the field of mere speculation and conjecture. . . . A jury cannot be allowed to merely theorize [the ultimate fact] from what might be a mere possibility." (Citations omitted.)

The standard of review for this court in passing on the correctness of the trial court's decision to direct the verdict "is whether the trial court was clearly wrong." *Greiten v. La Dow,* 70 Wis. 2d 589, 598, 235 N.W.2d 677, 683 (1975).

The defendant claims that the evidence of two suicide attempts, the peculiar look on his face before shooting Blalock, the mention of a schizophrenic thought disorder in the record and his head injury and accompanying headaches comprise sufficient amount of proof necessary for sending the question of mental disease or defect to the jury. As to the defendant's allegation of schizophrenic thought disorder, the opinions of the experts viewed in a light most favorable to the defendant were no more than conjecture and speculation. Dr. Crowley, the psychiatrist, was the defendant's most favorable expert and he stated several times that he was simply unable to determine whether or not the defendant was suffering from any mental disease or defect at the time the defendant's crimes were committed. Dr. Crowley never testified that the effect of any mental disease or defect the defendant might have suffered could cause the defendant to lack substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

Dr. Smail, the psychologist, was also unable to state whether the defendant suffered from a mental disease or defect. In his opinion it was not probable that the defendant suffered from any paranoid disorder. Smail, like Crowley, offered no testimony regarding the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

The report of the examination conducted at Central State Hospital indicated that there was "some evidence"

for the existence of schizophrenic thought disorder, but the ultimate conclusion of the staff was that the defendant was not mentally ill. His problem, the report concluded, was an antisocial personality.

A favorable expert opinion is not an indispensable prerequisite to a finding of mental disease or defect. However, the defendant presented no other evidence which would have enabled the jury to make the affirmative determination of mental disease or defect which the experts could not make. The defendant claimed he attempted suicide by using drugs and burning himself and was treated at a named but undescribed facility in Missouri. Dr. Crowley testified the defendant's claim that he twice attempted to commit suicide could have been verified. Such verification, according to Crowley, would only have required a release of information form from the defendant and a letter to the places where he claimed to have been treated. The defendant never attempted such verification. The evidence of the defendant's attempted suicide is mere speculation.

The defendant also claims his "peculiar look" prior to shooting Stanley Blalock in some way evidenced mental disease or defect. Stanley Blalock testified that after their argument and that prior to the shooting incident, the defendant "was sitting on the TV looking kind of strange . . . he was looking like he . . . was . . . up to something . . . a look like you have to just kill somebody." However, Blalock stated though the defendant did not generally possess that look, he had seen it before. Blalock stated the defendant may have been "on something." He said they were arguing and all of a sudden it seemed like something in the defendant snapped. Blalock opined that the defendant's look might have been due to drugs or due to the fact he was going to

assault him. It would be pure conjecture to conclude this "strange look" evidenced mental disease or defect. It would stretch the necessary standard of proof beyond credulity if we would conclude a "strange look" before attempting to murder another individual has any probative value of mental state or condition.

Lastly, the defendant claims he suffered from headaches and head injury. However, no evidence was presented that would have connected this condition to mental disease or defect. Moreover, loss of memory, according to Dr. Crowley, is not a characteristic of mental disease. Nor is there any testimony relating any amnesia condition to the commission of the offenses. According to reports, the defendant's electroencephalogram was normal. The defendant's brain had no organic lesions and his electric activity was also normal. Dr. Crowley testified that although an electroencephalogram with no abnormalities does not preclude the possibility of mental disease or defect, it does contradict the claim of head injury and headaches. Dr. Crowley testified that headaches and loss of memory are characteristically accompanied by organic difficulties. No organic problems were found.

None of the experts could testify that the defendant was amnesic or was malingering. More importantly, any such determination would have been irrelevant. Episodic amnesia, the inability to remember committing a crime, is not evidence of mental disease or mental defect.

No reasonable juror could conclude on the basis of the expert testimony that the defendant suffered from any mental disease or defect, much less that he lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law as a result of mental disease or defect.

*Joinder*

Section 971.12(1), (3) and (4), Stats.,[6] provides that two or more crimes may be charged in the same pleading if the crimes charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Also, it provides that the court may order two or more separately pleaded counts to be tried together if the crimes could have been joined in a single pleading. If it appears that a defendant or the state is prejudiced by a joinder of crimes, the court may order separate trials of counts or provide whatever justice requires.

---

[6] Sec. 971.12(1), (3) and (4), Stats., provides:

"971.12 **Joinder of crimes and of defendants.** (1) JOINDER OF CRIMES. Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. When a misdemeanor is joined with a felony, the trial shall be in the court with jurisdiction to try the felony.

". . . .

"(3) RELIEF FROM PREJUDICIAL JOINDER. If it appears that a defendant or the state is prejudiced by a joinder of crimes or of defendants in a complaint, information or indictment or by such joinder for trial together, the court may order separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. The district attorney shall advise the court prior to trial if he intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant.

"(4) TRIAL TOGETHER OF SEPARATE CHARGES. The court may order 2 or more complaints, informations or indictments to be tried together if the crimes and the defendants, if there is more than one, could have been joined in a single complaint, information or indictment. The procedure shall be the same as if the prosecution were under such single complaint, information or indictment."

We have considered whether the joinder of multiple crimes for trial was proper in the first instance. *Francis v. State,* 86 Wis. 2d 554, 556–61, 273 N.W.2d 310 (1979) and *see also State v. Hoffman,* 106 Wis. 2d 185, 208–09, 316 N.W.2d 143 (Ct. App. 1982). Since joinder has in past cases been found proper, no previous cases have considered whether misjoinder of different crimes allegedly committed by a single defendant can ever be harmless error.

If the offenses meet the criteria for joinder, it is presumed that the defendant will suffer no prejudice from a joint trial. The defendant may rebut the presumption by proving that he would be prejudiced by joinder in a particular case. Similarly, if the offenses do not meet the criteria for joinder, it is presumed that the defendant will be prejudiced by a joint trial. The state may rebut the presumption on appeal by demonstrating the defendant has not been prejudiced by a joint trial. We do not adopt a per se rule that misjoinder is prejudicial error and can never be harmless. It is only when it is determined prior to trial that joinder is proper, but it becomes apparent on appeal, as here, that the offenses were misjoined, that the state has any opportunity to demonstrate lack of prejudice. It is only in limited circumstance, therefore, that the harmless error rule ever affects the provisions for joinder.

Section 805.18(1), Stats.,[7] directs courts to "disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party" and in the same chapter of the statutes which contains the provisions for joinder and severance

---

[7] Sec. 805.18(1), provides:

"805.18 **Mistakes and omissions; harmless error. (1)** The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party."

the legislature has again emphasized that a criminal trial shall not be "affected by reason of any defect or imperfection in matters of form which do not prejudice the defendant." Sec. 971.26.[8]

The Judicial Council Committee's note to sec. 971.12, 1969, Wis. Laws at 644, states that Wisconsin's provisions for joinder and severance are taken from the federal rules of criminal procedure.[9] Federal cases may provide persuasive guidance to the proper application of state law copied from federal law. *Neylan v. Vorwald,* 124 Wis. 2d 85, 368 N.W.2d 648, slip op. at pp. 99, 100, *see* cases cited therein, *see also State v. Hoffman,* 106 Wis. 2d 185, 208 n. 8, 316 N.W.2d 143 (Ct. App. 1982).

There is a trend in widening the application of the harmless error doctrine to misjoinder. 8 J. Moore, Moore's Federal Practice, sec. 8.04(2) at 8–14 (1984). "The currently prevailing view in the majority of circuits is that misjoinder [of offenses] under rule 8(a) is subject to the doctrine of harmless error." *Id.* The same analysis is provided in Decker, *Joinder and Severance in Federal Criminal Cases; an Examination of Judicial Interpretation of the Federal Rules,* 53 Notre Dame Law 147, 165 (1977–78). The harmless error rule is recognized as a means of dealing with the mistakes which happen in any judicial proceeding. In *United States v. Hasting,* 103 S. Ct. 1974, 1980 (1983), the Supreme Court in discussing *Chapman v. United States,* 386 U.S. 18 (1967), stated:

---

[8] Sec. 971.26, Stats., provides:

"**971.26 Formal defects.** No indictment, information, complaint or warrant shall be invalid, nor shall the trial, judgment or other proceedings be affected by reason of any defect or imperfection in matters of form which do not prejudice the defendant."

[9] Sec. 971.12(1), Stats., reiterates Federal Rule 8(a); subsec. (2) Rule 8(b); subsec. (3) Rule 14 with some additions; and subsec. (4) Rule 13.

"In holding that the harmless error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. *Brown v. United States,* 411 U.S. 223, 231–232, 93 S. Ct. 1565, 1570, 36 L. Ed 2d 208 (1973), citing *Bruton v. United States,* 391 U.S. 123, 135, 88 S. Ct. 1620, 1627, 20 L. Ed 2d 476 (1968); cf. *Engle v. Isaac,* 456 U.S. 107, 102 S. Ct. 1558, 1574, 71 L. Ed. 2d 783 (1982)." (Footnotes omitted.)

The purpose of the joinder provisions is " ' "to promote economy and efficiency [in judicial administration] and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." ' " *United States v. Seidel,* 620 F.2d 1006, 1008–09 (4th Cir. 1980), quoting *Bruton v. United States,* 391 U.S. 123, 131 n. 6 (1968). We stated in *State v. Hall,* 103 Wis. 2d 125, 141, 307 N.W.2d 289 (1981):

"The general rule that has evolved from the cited cases is that joinder will be allowed in the interest of the public in promoting efficient judicial administration and court fiscal responsibility in conducting a trial on multiple counts in the absence of a showing of substantial prejudice."

This purpose would be substantially defeated if a defendant were entitled to separate new trials on all previously misjoined offenses, even when the defendant actually suffered no prejudice from the misjoinder.

We hold that misjoinder of offenses in some circumstances may be harmless.

"Such a policy is acceptable and even desirable when harmlessness is demonstrated by overwhelming evidence of guilt or when the court is convinced for other reasons that 'the error did not influence the jury or had but very slight effect.' Defendants will suffer from the application of [the harmless error rule] to [misjoinder] only if, in the name of 'efficiency,' the doctrine is not carefully and strictly construed." (Footnotes omitted.) Moore, sec. 8.04(2) at 8–18 to 8–19.

In all the charges against this defendant there was only one real contested issue, and that issue was identical in each case, *i.e.*, the existence of mental disease or defect at the time the charged crimes were committed. The overriding issue of not guilty by reason of mental disease or defect was presented by the same witnesses, the psychiatrist and the psychologist. There was no prejudice to the defendant by trying the charges together. His plea of not guilty to each of the charges challenged the state's sufficiency of evidence as to guilt for each charge. The state's proof of guilt of the defendant as to each charge was not only sufficient but overwhelming. The defendant offered no evidence in defense of or in explanation to any of the individual charges, but rather he offered inadequate and incomplete expert opinions relevant to all of the charges.

The potential problem as a result of a trial on joint charges is that a defendant may suffer prejudice since a jury may be incapable of separating the evidence relevant to each offense or because the jury may perceive a defendant accused of several crimes is predisposed to committing criminal acts. *State v. Bettinger,* 100 Wis. 2d 691, 696–97, 303 N.W.2d 585 (1981). As to the first concern, there is no prejudice from misjoinder when the several counts are logically, factually and legally distinct, so that the jury does not become confused about which evidence relates to which crime and considers each of them separately. *United States v. Parson,* 452 F2d 1007,

1008–09 (9th Cir 1971), *United States v. Friedman,* 445 F.2d 1076, 1082–83 (9th Cir 1971). As to the second concern, misjoinder may also be harmless when evidence of the defendant's guilt of each offense is overwhelming, *see United States v. Martin,* 567 F2d 849, 854 (9th Cir. 1977) ; *United States v. Parson,* 452 F.2d at 1008–09.

In this case each criminally charged episode was factually distinct from all the others. Each occurred on a different date, in a different locality, in a different manner and involved different victims. There was no possibility the jurors could confuse the proof received on each separate and distinct criminal occurrence.

The crimes were tried separately, although in the same proceeding. First, the prosecutor presented all the evidence with respect to the attempted murder of Stanley Blalock. When all relevant evidence to that charge was completed, the prosecutor presented all the witnesses to the robbery and related crimes committed on Milwaukee's far northwest side on January 29, 1982. Next, the witnesses to the robbery and related crimes committed in Glendale on February 6, 1982, were presented. Finally, all the witnesses to the attempted robbery of a downtown disco in which he was apprehended were presented. At the guilt phase the defense presented only a character witness whose testimony was equally relevant to all counts.

The jury was expressly instructed to consider each count separately. The jury was also instructed not to let the defendant's guilt or innocence on one count affect its verdict on any other count. Only cynicism would suggest this instruction was disregarded by the jury since the proof of the defendant's guilt as to each crime was overwhelming as proven by separate evidence. It is presumed that a properly given admonitory instruction is followed when as here the crimes were completely distinguishable and unrelated in time, place and victim.

Any reasonable jury presented with strong, uncontradicted evidence to support each crime charged would have convicted the defendant on all counts, whether the evidence was presented in a single trial or four separate trials. Any error in presenting the evidence in a single trial did not influence the jury or had only slight effect. We conclude therefore that the misjoinder was harmless. The test to be applied for considering harmless error was just stated by this court in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222, filed this same date, accepting *Strickland v. Washington,* 104 S. Ct. 2052 (1984) as there is no reasonable possibility that the error contributed to the conviction.[10] Applying that test to the instant case of misjoinder, we find that there is no reasonable possibility that the error contributed to the conviction of the defendant as to any of the separate charges. It would be now, as it would have been then, a waste of judicial efficiency and expense with no concurrent potential for a different result to have tried the defendant separately as to each charge. If that had been done, the same defense of mental disease or defect would have been proffered in each trial with the same result of that evidence not having any convincing power and the evidence of guilt in each trial being overwhelming with no defense offered.

Since the trial judge had no way of knowing the conclusiveness of the state's proof for each crime, it was an error to join them and therefore create the misjoinder. However, our authority is to apply the test of harmless error when appropriate and in doing that, we find no reasonable possibility that the error contributed to the convictions. We reject a per se rule of prejudice to the

[10] As my dissent in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222, states, I believe the test should be reasonable probability for correctness and also to be in conformity with *Strickland.*

defendant for misjoinder. Each case and circumstance must be examined and considered with the state bearing the burden in misjoinder cases of demonstrating the lack of reasonable possibility that the error contributed to the conviction.

The directed verdict on the defense of the defendant's mental disease or defect was appropriate in the absence of any credible relevant evidence being presented upholding that defense. The error of misjoinder was harmless since there was no reasonable possibility of its affecting the convictions.

The defendant raises two additional issues: was he denied due process by being compelled to proceed to trial while claiming amnesia, and secondly, was he denied his right to effective assistance of counsel on the attempted murder charge because his counsel failed to request an instruction on the lesser included offense of endangering safety by conduct regardless of life. We reject the defendant's arguments as to both issues. The defendant failed to prove by clear and convincing evidence that he suffered from amnesia and that it precluded him from understanding the proceedings against him or that it prevented him from assisting in his defense. In fact, the findings of the experts were just the opposite. As to the defendant's claim he was denied his right to effective assistance of counsel, the defendant failed to meet the test required for the submission of a lesser included offense. Thus, he was not prejudiced by his counsel's oversight. "Submission of a lesser included offense instruction is proper *only* when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense." *State v. Sarabia,* 118 Wis. 2d 655, 661, 348 N.W.2d 527, 531 (1984) ; *see also Jordan v. State,* 93 Wis. 2d 449, 468, 287 N.W.2d 509 (1980). In reviewing the evidence

in a light most favorable to the defendant, we conclude it does not reasonably support acquittal on the attempted first-degree murder charge.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). (No opinion filed.)

WILLIAM A. BABLITCH, J. (dissenting). I dissent. The majority, relying on the State of Wisconsin's concession at oral argument, assumes that the trial court violated sec. 971.12(1), Stats., by improperly joining charges relating to four separate and distinct incidents. The majority states that if offenses do not meet the criteria for joinder, it may be presumed that the defendant will be prejudiced by a joint trial. Slip opinion at page 668. Despite this recognition of probable prejudice, the majority fails to adopt a *per se* rule that misjoinder is prejudicial error and concludes that misjoinder is harmless error in this case. Because I believe that misjoinder is *per se* prejudicial error, I find that application of a harmless error rule to misjoinder situations is unreasonable.

As the majority states, the Judicial Council Committee's note to sec. 971.12, Stats. 1969, Wis. Laws at 644, states that Wisconsin's provisions for joinder and severance are taken from the federal rules of criminal procedure. Thus, federal cases construing Fed. R. Crim. P. 8 provide persuasive guidance to this court for the proper application of sec. 971.12. Federal courts are currently divided as to whether a harmless error analysis is applicable to the misjoinder of charges. I find that the best approach, adopted by the court of appeals below, is to treat misjoinder as *per se* impermissible and consequently to reject harmless error treatment. *State v.*

*Leach,* 122 Wis. 2d 339, 352–58, 363 N.W.2d 234 (Ct. App. 1984).

The First Circuit Court of Appeals noted that joinder of offenses has the desirable effect of promoting judicial economy. *United States v. Turkette,* 632 F.2d 896, 906 (1st Cr. 1980), *rev'd on other grounds,* 452 U.S. 576 (1981). The court further noted that in permitting joinder if certain requirements are met, Fed. R. Crim. P. 8, balances the competing considerations of the benefit to the court, prosecution, and the public with the presumptive prejudice inherent in. the consolidation of offenses. *Turkette* at 906. The court stated that "Rule 8 'set the limits of tolerance' beyond which the danger of prejudice outweighs the benefit, and any joinder which does not fall within Rule 8 'is per se impermissible.' " *Id.* (citation and footnote omitted.) *Accord Cf. United States v. Graci,* 504 F.2d 411 (3rd Cir 1974) ; *United States v. Nettles,* 570 F.2d 547 (5th Cir. 1978) (misjoinder of defendants is inherently prejudicial) ; *United States v. Whitehead,* 539 F.2d 1023 (4th Cir. 1976) (misjoinder of defendants is *per se* impermissible). *See Note, Harmless Error and Misjoinder Under the Federal Rules of Criminal Procedure: A Narrowing Division of Opinion,* 6 Hofstra L. Rev. 533, 563 (1979). *See also* 8 J. Moore, *Moore's Federal Practice,* para. 8.04[2] (2d ed. 1984) ; C. Wright, *Federal Practice and Procedure,* sec. 143, at 491 n. 19 (1982).

This court has recognized the prejudice which arises to an accused from a trial on multiple counts. In *State v. Bettinger,* 100 Wis. 2d 691, 696–97, 303 N.W.2d 585 (1981), this court stated:

"We have recognized that the defendant suffers a risk of prejudice when he is tried on the basis of an information containing multiple counts. The risk of prejudice arising under these circumstances is related to the prejudice which arises when evidence of other crimes or

wrongful acts is admitted improperly at trial. *See* sec. 904.04(2), Stats. When a jury is informed of the accused's previous wrongful conduct, it is likely that it will consider that the defendant is a 'bad person' prone to criminal conduct. It is also possible that the jury will confuse the issues and will be incapable of separating the evidence. Therefore there is a serious risk that a conviction will result without regard to the facts proven relative to the crime charged. *Similarly, when some evidence is introduced to prove the commission of multiple criminal acts joined in one information, there is a risk that the defendant will be convicted not because the facts demonstrate guilt beyond a reasonable doubt but because the jury may conclude that the accused is predisposed to committing crimes and that 'some' evidence is 'enough' evidence to return a conviction. In a trial on joint charges, there is also the possibility that the jury will cumulate the evidence of the crimes charged and find guilt when it otherwise would not if the crimes were separately tried.*" *Id.* (Emphasis added.)

Section 971.12, Stats., like its federal counterpart Rule 8, sets forth circumstances in which charges may be joined, despite the risk of prejudice, because evidence of one crime will also be relevant and admissible on another charge. The gravamen of joinder under this statute is the similarity or interrelatedness of offenses. *Turkette* at 907. Thus, the preconditions for the joinder of charges set forth in sec. 971.12(1), are designed to safeguard an accused's right to a fair trial against the improper use of inherently prejudicial "other crimes" evidence. When charges are misjoined, the jury is invariably confronted wth highly prejudicial "other crimes" evidence which would be inadmissible if the charges were tried separately. Thus, application of a harmless error analysis in the case of misjoinder effectively undermines the interests sec. 971.12(1) were designed to safeguard.

In the instant case, the majority takes solace because the several counts with which Leach was charged were logically, factually and legally distinct. P. 672. From this it concludes that there was no possibility that the jurors could have confused the proof received on each separate and distinct criminal charge. *Id.* While this may be true, it does not negate the serious possibility that the jury may have perceived that the defendant was predisposed to criminal activity and convicted him as a result after hearing proof on each of the separate charges.

I reject the majority's attempt to minimize the prejudice that may have ensued to Leach through its assertion that misjoinder may be harmless when the defendant's guilt of each offense is overwhelming. *Id.* The majority's conclusion that any reasonable jury presented with strong, uncontradicted evidence to support each crime charged would have convicted the defendant on all four counts, whether the evidence was presented in a single trial or four separate trials, is mere speculation. *Id.* at 23. I believe that it is virtually impossible for a reviewing court to determine whether a jury confronted by "other crimes" evidence reached its verdict solely because it perceived the accused as a bad or dangerous man deserving conviction. *Note* at 563.

The court of appeals, in rejecting application of the harmless error rule to misjoinder situations, reasoned that adoption of such a rule would effectively eliminate sec. 971.12(1), Stats. *Leach* at 356. Section 971.12(3) allows severance as relief from prejudicial joinder even though the joinder was proper. The court of appeals stated, and I agree that "[i]f we were to hold that misjoinder could be harmless and that reversal is required only when the misjoinder was prejudicial, sec. 971.12(1)

would no longer be necessary." *Id.* at 356. Wright applied a similar analysis to the federal joinder provision, stating:

"In the First Edition of this Treatise, the view was taken that misjoinder cannot be regarded as harmless error by the appellate court. This position was supported overwhelmingly at that time by the cases, and seemed to be supported by logic as well. The argument is that there is no point in having Rule 8 if the harmless error concept is applicable to it. If that concept could be applied, then defendant could obtain reversal only if the joinder were prejudicial to him. But Rule 14 provides for relief from prejudicial joinder, and a defendant can obtain a reversal, in theory at least, if he has been prejudiced even though the joinder was proper. If misjoinder can be regarded as harmless error, then reversal could be had only for prejudice whether the initial joinder was proper or improper. If that were true, it would be pointless to define in Rule 8 the limits on joinder, since it would no longer be of significance whether those limits were complied with, and the draftsmen would have been better advised to allow unlimited joinder of offenses and defendants, subject to the power of the court to give relief if the joinder were prejudicial. They did not follow such a course, and this suggests that misjoinder can never be harmless error." C. Wright, *Federal Practice and Procedure: Criminal 2d,* sec. 145, p. 529–30. (Footnotes omitted.)

The legislature, in recognizing that the joinder of certain offenses will unfairly prejudice the accused, has placed a limit on the trial court's authority to conduct single trials involving multiple charges. The majority's decision, through the use of its harmless error analysis, abrogates the "limits of tolerance" beyond which any misjoinder is "per se impermissible." In so doing, the majority permits the benefits of judicial economy to outweigh the defendant's rights to a trial free from prejudice. Accordingly, I dissent.

Because I determine that misjoinder is *per se* impermissible and that Leach is entitled to a new trial, I do not reach the issue of whether the trial court erred in directing a verdict against the defendant in the second phase of his bifurcated trial.

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN joins in this dissent.